739 So.2d 568 (1999)
Nathan Joe RAMIREZ, Appellant,
v.
STATE of Florida, Appellee.
No. 89,377
Supreme Court of Florida.
July 8, 1999.
Rehearing Denied September 13, 1999.
*571 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Nathan Ramirez. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we reverse the conviction and sentence and remand for a new trial.
Nathan Ramirez and Jonathan Grimshaw were both found guilty, after separate trials, of the first-degree murder of Mildred Boroski. Grimshaw was sentenced to life in prison,[1] and Ramirez, age seventeen, was sentenced to death.
On appeal, Ramirez raises four issues: (1) that the State failed to sustain its burden of showing that his confession was voluntary and taken in compliance with Miranda[2]; (2) that his constitutional right to confront and cross-examine witnesses against him was violated when a sheriffs detective testified regarding details of Grimshaw's confession implicating Ramirez; (3) that the cold, calculated and premeditated aggravator (CCP) was not supported by the evidence and was inconsistent with a finding of the avoid arrest aggravator; and (4) that the imposition of the death penalty was disproportionate. We turn now to our consideration of these issues.

SUPPRESSION OF THE CONFESSION
Both prior to and during trial, Ramirez moved to suppress his confession. The trial court denied both motions and the confession was introduced as substantive evidence against him. The pertinent facts surrounding the confession follow.
The victim's body was found in an open field not far from her home. Her death was caused by two gunshot wounds to the head. The subsequent investigation revealed that someone had broken into her home and stolen some items of jewelry, her gun, and about $35. There was evidence that the victim had been raped before her death.
Grimshaw, who was the victim's neighbor, soon became a suspect. After several interviews and a final interrogation lasting several hours, Grimshaw confessed his involvement in the crime. Although Grimshaw gave several inconsistent versions of events, he eventually admitted his involvement in the crime, but pointed to Ramirez as the ringleader.
*572 In order to convince the police of the truthfulness of his statements regarding Ramirez's involvement, Grimshaw phoned Ramirez from the station while the sheriffs detectives listened in and recorded the call. During the call, Ramirez and Grimshaw discussed the items of physical evidence related to the crime that were in Ramirez's possession and made plans to destroy the victim's automobile to eliminate evidence of the crime.
Ramirez was at home around three o'clock that afternoon when, shortly after the phone call, a sheriffs deputy arrived wearing a badge and carrying a firearm. The deputy asked Ramirez to produce the physical evidence in his possession linked to the murder, including the suspected murder weapon and some of the victim's jewelry. According to the deputy, Ramirez was a "little hesitant at first, [and] denied having the articles." After the deputy informed Ramirez that he knew about the phone conversation with Grimshaw, Ramirez turned over the items that were in the house and accompanied the deputy to retrieve other items. The deputy then asked Ramirez if he would be "willing to come with [him] to the sheriffs office" to speak with a detective. Once transported to the station, Ramirez was placed in a small room and questioned by two other detectives.
The entire interrogation at the station was videotaped and is part of the record on appeal. The videotape reveals that the lead detective began the interrogation by questioning Ramirez about how the items came into his possession. When Ramirez initially claimed that Grimshaw gave him the items, one of the detectives informed Ramirez that:
[R]esources indicate that you may have some involvement in the case.... What I want you to do is I want you to be honest with me. The indication we have is that both you and John [Grimshaw] are involved.... I want you to tell me what happened that night. I know you were there. I wouldn't be here if I didn't know that. You know what I'm saying?
After these statements by the detective, Ramirez admitted breaking into the victim's house the night of the murder.
It was only after this admission that the second detective suggested that Ramirez be informed of his Miranda rights. The detective said:
Why don't you let Nate [Ramirez] know about his rights. I mean, he's already told us about going in the house and whatever. I don't think that's going to change Nate's desire to cooperate with us.
Ramirez then asked if he was "like being placed under arrest?" to which the other detective responded, "No, no, I'm just reading your rights at this time." After the Miranda rights were administered, Ramirez acknowledged what the detective had read by nodding and stating, "I guess that is what I'm here for."
Ramirez eventually admitted his involvement not only in the burglary, but also in the murder. He stated that he was the one who shot the victim, denied any involvement in the rape, and claimed that he was acting at Grimshaw's direction. Only after Ramirez fully confessed to the murder did the detectives belatedly obtain a written waiver of his Miranda rights. When Ramirez was asked to sign the waiver of rights form after he had fully confessed, the lead detective asked him to acknowledge that he had not been promised anything or been threatened before giving his statement. Ramirez's response was that the detective had only promised to be his friend.
Both the United States and Florida Constitutions provide that persons shall not be "compelled" to be witnesses against themselves in any criminal matter. U.S. Const. amend. V; Art. I, § 9, Fla. Const. This constitutional guarantee "is fully applicable during a period of custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 460-61, 86 S.Ct. 1602, 16 L.Ed.2d *573 694 (1966). Thus, to be admissible in a criminal trial, the State must prove that the confession was not compelled, but was voluntarily made. See, e.g., Miranda, 384 U.S. at 442-44, 86 S.Ct. 1602; Traylor v. State, 596 So.2d 957, 964-65 (Fla.1992).
In Miranda, the United States Supreme Court enunciated a bright-line rule to guard against compulsion and the coercive nature and atmosphere of custodial interrogation, and "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." 384 U.S. at 469, 86 S.Ct. 1602. Miranda requires that police inform suspects that they have the right to remain silent, and that anything they do say can be used against them in court. 384 U.S. at 468-69, 86 S.Ct. 1602. Suspects must also be informed that they have a right to an attorney during questioning, and that if they cannot afford an attorney, one will be appointed for them without cost. See id. at 467-76, 86 S.Ct. 1602; Traylor, 596 So.2d at 966.
"The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." Miranda, 384 U.S. at 476, 86 S.Ct. 1602. The Miranda court concluded that
without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.
Id. at 467, 86 S.Ct. 1602. Therefore, "unless and until [the Miranda] warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the defendant]." Miranda, 384 U.S. at 479, 86 S.Ct. 1602. The protections enunciated in Miranda have been part of this State's jurisprudence for over a century pursuant to the Florida Constitution. See Traylor, 596 So.2d at 964-66.[3]
Ramirez argues that the requirements of Miranda were violated because the warnings were not administered before the interrogation began, rendering his confession to the crime inadmissible. "Interrogation takes place ... when a person is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response." Traylor, 596 So.2d at 966 n. 17. There is no question in this case that Ramirez was subjected to interrogation and was not initially informed of his Miranda rights. However, the State argues that Miranda warnings were not required because Ramirez was not in custody at the time that he was interrogated at the police station. We disagree.
Custody for purposes of Miranda encompasses not only formal arrest, but any restraint on freedom of movement of the degree associated with formal arrest. See Arbelaez v. State, 626 So.2d 169, 175 (Fla.1993). A person is in custody if a reasonable person placed in the same position would believe that his or her freedom of action was curtailed to a degree associated with actual arrest. See Traylor, 596 So.2d at 966 n. 16; Roman v. State, 475 So.2d 1228, 1231 (Fla.1985). "The proper inquiry is not the unarticulated plan of the police, but rather how a reasonable person in the suspect's position would have perceived the situation." Davis v. State, 698 So.2d 1182, 1188 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1076, ___ L.Ed.2d ___ (1998); see Roman, 475 So.2d at 1231.
*574 The question of whether a suspect is in custody is a mixed question of law and fact. See Thompson v. Keohane, 516 U.S. 99, 106-07, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The four-factor test adopted by the Iowa Supreme Court provides guidance in making the determination whether a reasonable person in the suspect's position would consider himself in custody: (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning. See State v. Countryman, 572 N.W.2d 553, 558 (Iowa 1997). Although not set forth as a "four-factor test," our case law includes a consideration of these same factors. See Caso v. State, 524 So.2d 422, 424 (Fla.1988); Roman, 475 So.2d at 1231; Drake v. State, 441 So.2d 1079, 1081 (Fla.1983).
Considering these factors, it is uncontroverted that by the time the detective came to Ramirez's home to request that he turn over the items of physical evidence related to the crime, Grimshaw had implicated Ramirez as a principal in the murder, and the police had listened in on the phone call with Grimshaw during which Ramirez admitted that he had items of physical evidence directly related to the crime. By the time Ramirez was brought to the police station for questioning, he had in fact turned over that physical evidence. The detectives told Ramirez that they knew he was involved. While the police may not have told Ramirez that he was under arrest, he was never told he was free to leave. They undoubtedly had probable cause to arrest him.
The record reflects that Ramirez was a juvenile (he had just turned seventeen) and had only limited contact with the justice system.[4] We conclude that not only a reasonable juvenile, but even a reasonable adult in Ramirez's position, would have believed that he was in custody at the time of the interrogation at the police station: he was questioned in a small room in the police station by two detectives, he was never told he was free to leave, and all of the questions indicated that the detectives considered him a suspect.
Short of being handcuffed and being told that he was under arrest, we cannot perceive of circumstances that would be more indicative of a custodial interrogation than the circumstances of the interrogation in this case. Therefore, the Miranda warnings should have been administered prior to any questioning. See Caso, 524 So.2d at 422; Drake, 441 So.2d at 1081; see also B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989). Accordingly, the statements elicited prior to the Miranda warnings should have been suppressed, and it was error to admit them against Ramirez.
As to the statements elicited after the Miranda warnings were finally given, the United States Supreme Court explained in Oregon v. Elstad, 470 U.S. 298, 310-11, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), that the failure to administer the Miranda warnings before eliciting a confession does not necessarily render any subsequently warned statement inadmissible. Instead, if a "careful and thorough administration" of the Miranda warnings are later given, and the Miranda rights are waived, the condition that "rendered the unwarned statement inadmissible" is "cure[d]." Elstad, 470 U.S. at 311, 105 S.Ct. 1285; see Davis, 698 So.2d at 1189; Henry v. State, 613 So.2d 429, 431 (Fla. 1992).
*575 In Elstad, the police first questioned the defendant, who was eighteen and in his home in the presence of his parents, without the Miranda warnings having been administered. 470 U.S. at 300-01, 105 S.Ct. 1285. The defendant responded to the questioning with inculpatory statements. See id. at 301, 105 S.Ct. 1285. Police then transported him to the station and fully advised him of his rights, whereafter he executed a written statement. See id. at 301-02, 105 S.Ct. 1285. The Supreme Court concluded that the first statements were properly suppressed, but that it was not necessary to suppress the statements made after the Miranda waiver, which was knowing, intelligent and voluntary. See id. at 315-18, 105 S.Ct. 1285.
By contrast, in this case police began questioning Ramirez at the police station after failing to first administer the Miranda warnings. When the police finally administered the Miranda warnings, the administration was not careful and thorough. To the contrary, there was a concerted effort to minimize and downplay the significance of the Miranda rights.
As explained in Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), Miranda "echo[ed]" the standard of Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), in holding that a defendant may waive the Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." (Quoting Miranda, 384 U.S. at 444, 86 S.Ct. 1602). Whether the rights were validly waived must be ascertained from two separate inquiries:
First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
Moran, 475 U.S. at 421, 106 S.Ct. 1135 (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)); see Colorado v. Spring, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); Sliney v. State, 699 So.2d 662, 668 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998).
The State bears the burden of proving that the waiver of the Miranda rights was knowing, intelligent and voluntary. See Sliney, 699 So.2d at 667; Thompson v. State, 548 So.2d 198, 204 (Fla.1989). Moreover, where a confession is obtained after the administration of the Miranda warnings, the State bears a "`heavy burden'" to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel, especially where the suspect is a juvenile. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Fare, 442 U.S. at 724, 99 S.Ct. 2560; Miranda, 384 U.S. at 475, 86 S.Ct. 1602; W.M. v. State, 585 So.2d 979, 981 (Fla. 4th DCA 1991). The State must establish its "`heavy' burden" by the "preponderance of the evidence." Connelly, 479 U.S. at 167-68, 107 S.Ct. 515; see Balthazar v. State, 549 So.2d 661, 661 (Fla.1989); W.M., 585 So.2d at 983. As the United States Supreme Court has made clear, the ultimate issue of voluntariness is a legal rather than factual question. See Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).
The "totality of the circumstances" to be considered in determining whether a waiver of Miranda warnings is valid based on the two-pronged approach of Moran may include factors that are also considered in determining whether the confession itself is voluntary. See Sliney, 699 So.2d at 669; see also State v. Sawyer, *576 561 So.2d 278, 284-85 (Fla. 2nd DCA 1990). The factors that we consider relevant here include: (1) the manner in which the Miranda rights were administered, including any cajoling or trickery; see Miranda, 384 U.S. at 476, 86 S.Ct. 1602; Brewer v. State, 386 So.2d 232, 237 (Fla. 1980); (2) the suspect's age, experience, background and intelligence, see State v. S.L.W., 465 So.2d 1231, 1232 (Fla.1985) (quoting Fare, 442 U.S. at 724-25, 99 S.Ct. 2560); Doerr v. State, 383 So.2d 905, 907 (Fla.1980); (3) the fact that the suspect's parents were not contacted and the juvenile was not given an opportunity to consult with his parents before questioning, see Doerr, 383 So.2d at 907; (4) the fact that the questioning took place in the station house, see Drake, 441 So.2d at 1081; and (5) the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset, see Sliney, 699 So.2d at 669 n. 10; Traylor, 596 So.2d at 966.
First, we find the manner in which the Miranda rights were administered to be a critical factor in determining that the waiver in this case was not knowing, voluntary or intelligent. The Supreme Court has explained that the question of whether the suspect has validly waived his rights "is not one of form." Fare, 442 U.S. at 724, 99 S.Ct. 2560 (quoting North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Miranda, 384 U.S. at 476, 86 S.Ct. 1602. The voluntariness of a waiver "depend[s] on the absence of police overreaching." Connelly, 479 U.S. at 170, 107 S.Ct. 515.
In this case, the Miranda warnings were not given until Ramirez had made significant admissions of guilt. Then, immediately before administering the Miranda warnings, one of the detectives minimized their significance by suggesting in a casual, offhand manner that he did not expect Ramirez to invoke his rights: "I mean, he's already told us about going in the house and whatever. I don't think [the Miranda warnings are] going to change Nate's desire to cooperate with us."
To state to a juvenile that the Miranda warnings would not change his desire to cooperate, thus suggesting that they have no significance, undermines the very purpose of Miranda. As we have explained: "[T]he requirement of giving Miranda warnings before custodial interrogation is a prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings." Davis, 698 So.2d at 1189; see New York v. Quarles, 467 U.S. 649, 653, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).
The manner in which the rights were administered in this case was not a "thorough and careful administration" of the rights, such as those that rendered the subsequent confession admissible in Eldstad. Instead, the actions of the police in this case were the kind of "cajoling" and "trickery" about which the Supreme Court warned in Miranda. Cf. People v. Honeycutt, 20 Cal.3d 150, 141 Cal.Rptr. 698, 570 P.2d 1050, 1055 (1977). Moreover, by suggesting that Ramirez would not invoke his rights because he had "already told [them] about going into the house," the detectives exploited his prior unwarned statements and used them against him. In contrast, in Elstad the Supreme Court observed that the officers in that case did not exploit the suspect's unwarned admissions to secure the subsequent waiver of the rights. 470 U.S. at 316, 105 S.Ct. 1285. This case is also in sharp contrast to Fare, where the police officers interrogating the suspect "took care" to ensure that the suspect understood his rights. 442 U.S. at 726, 99 S.Ct. 2560.
Further, after being told he was to be read his rights, Ramirez responded by asking if he was under arrest. The detectives answered "no." However, by the *577 time the warnings were given, Ramirez had already implicated himself in the crime and the detectives had independent corroboration of his involvement and ample probable cause to arrest him for murder. In fact, the detectives did arrest Ramirez upon completion of the interrogation. It is simply inappropriate for the police to make a representation intended to lull a young defendant into a false sense of security and calculated to delude him as to his true position at the very moment that the Miranda warnings are about to be administered. See Brewer, 386 So.2d at 237; Sawyer, 561 So.2d at 290-91; see also Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Escobar v. State, 699 So.2d 984, 987 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998).
In conjunction with the circumstances surrounding the administration of the Miranda warnings, we consider the fact that Ramirez was a juvenile and had only limited experience with the with the criminal justice system. See supra note 4. Neither this Court nor the United States Supreme Court has adopted a bright-line rule that would render a confession by a juvenile involuntary. See Gallegos v. Colorado, 370 U.S. 49, 52-55, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); State v. Francois, 197 So.2d 492, 493-95 (Fla.1967). Instead, we look to the juvenile's age, along with his experience, education, background and intelligence,[5] in assessing whether the waiver is knowing, voluntary and intelligent. See S.L.W., 465 So.2d at 1232 (quoting Fare, 442 U.S. at 724-25, 99 S.Ct. 2560); see also Doerr, 383 So.2d at 907; Rimpel v. State, 607 So.2d 502, 503 (Fla. 3d DCA 1992).
In conjunction with this age-related inquiry, we also consider the fact that because Ramirez was a juvenile, police were obligated to attempt, and "continue such attempt," to notify his parents upon taking him into custody. § 39.037(2), Fla. Stat. (1995) (emphasis supplied).[6] Although the failure to comply with this statutory requirement does not render a confession involuntary, we have found that: "`The fact that a juvenile's confession was given before he had the opportunity to talk with his parents or an attorney is certainly a factor militating against its admissibility.'" Doerr, 383 So.2d at 907 (quoting Doerr v. State, 348 So.2d 938, 941 (Fla. 2d DCA 1977));[7]see also Allen v. State, 636 So.2d 494, 496 n. 2 (Fla.1994). We find that this analysis applies with equal force when determining the knowing, intelligent and voluntary nature of a Miranda waiver, especially in light of the manner in which the Miranda warnings were administered in this case.
In Allen, we found that it was error for police to continue questioning the suspect after his mother had requested to speak with him, citing to section 39.037(2). 636 So.2d at 496. In this case, Ramirez's parents were not even given an opportunity to see or speak with their son before or during his questioning. The fact that Ramirez's parents were not given an opportunity to be present during the interrogation distinguishes such cases as Ross v. State, 386 So.2d 1191 (Fla.1980), and Rimpel, where the parents were either present during the juvenile's questioning or offered *578 an opportunity to be present. See also S.L.W., 465 So.2d at 1232 (juvenile defendant's statement given in driveway of the home of his temporary foster family). Further, this case is distinguishable from Bonifay v. State, 626 So.2d 1310, 1312 (Fla.1993), where the suspect was offered an opportunity to have his parents or attorney present at his interrogation, but "specifically did not want his parents to be contacted." Compare Snipes v. State, 24 Fla. L. Weekly S191, 733 So.2d 1000 (Fla. 1999) (confession was not involuntary where juvenile's mother had been informed that he was being taken to jail; juvenile had a GED; juvenile was administered the Miranda warnings before confessing; the interrogation lasted for less than twenty minutes; the juvenile signed a written waiver form).
The State maintains that some attempts were made to contact Ramirez's parents earlier. However, the statute would be rendered meaningless if all that is required are perfunctory attempts to contact a juvenile's parents. Here, the State, who must bear the burden of demonstrating statutory compliance, did not present evidence of any meaningful or continuing attempt to contact Ramirez's parents.[8]
Finally, when the warnings were administered, they were administered orally. A written waiver of the warnings was not secured until after Ramirez had fully confessed his involvement in the crime. Whether the waiver of the Miranda rights is in writing is one more factor to consider in evaluating the totality of the circumstances. See Sliney, 699 So.2d at 669 n. 10; see also Traylor, 596 So.2d at 966.
In this case, we stress that neither the veracity nor the credibility of the detectives is at issue, but only the uncontroverted facts, including: the fact that the detectives delayed administering the Miranda warnings until Ramirez made inculpatory admissions; the fact that no careful and thorough administrations of the Miranda rights occurredinstead, before administering the Miranda warnings the detective diluted their effect by downplaying their significance; the fact that when administering the warnings the detectives used Ramirez's previous unwarned inculpatory statements to suggest he would not invoke his rights; the fact that Ramirez was a juvenile, with little experience in the criminal justice system; the fact that his parents were not present when he was interrogated; and the fact that the waiver of the rights was not in writing. Based on the totality of these circumstances, we find that the oral waiver was invalid as a matter of law. Accordingly, we conclude that the confession should have been suppressed. Because we cannot conclude that the admission of the confession was harmless beyond a reasonable doubt, a new trial is required. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).

QUESTIONING REGARDING THE CODEFENDANT'S CONFESSION
Further, since we are reversing for a new trial, we also discuss the erroneous admission of the details of Grimshaw's confession implicating Ramirez. During the cross-examination of one of the detectives during the guilt phase, defense counsel inquired whether it was the true that Grimshaw had given so many versions of *579 events that the police did not know who to suspect, whether it was true that Grimshaw led detectives on a "merry chase" in the wrong direction in a bogus search for the body, whether it was true that Ramirez cast blame on Grimshaw as the leader of events the night of the murder, and whether the detective had any evidence contrary to Ramirez's claims that he was not involved in the sexual assault on the victim and that he murdered her because Grimshaw told him to do so.
On redirect, over objection, the prosecutor was permitted to elicit not just that Grimshaw's confession was "evidence" contradicting Ramirez's claims of what took place, but also details from Grimshaw's confession, including Grimshaw's statement that it was Ramirez who wanted to kill the victim. The prosecutor maintained to the trial court that he was permitted to elicit the details of Grimshaw's statements because Ramirez "brought up" the subject on cross-examination.
The State concedes that under most circumstances it is error to admit the details of a non-testifying codefendant's confession into evidence against the defendant. This is because admission of a codefendant's statements is inadmissible hearsay and violates the Confrontation Clause of the Sixth Amendment to the United States Constitution. See Lee v. Illinois, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); Bruton v. United States, 391 U.S. 123, 128, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Franqui v. State, 699 So.2d 1312, 1318 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), and cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 796 (1998).[9] A codefendant's statements are especially suspect because he has a strong motivation to implicate another, rendering these statements even less credible than ordinary hearsay. See Lee, 476 U.S. at 541, 106 S.Ct. 2056; Farina v. State, 679 So.2d 1151, 1155 (Fla.1996).
However, the State maintains that the questioning was permissible during the State's redirect because Ramirez himself "opened the door" to this testimony during the cross-examination of the detective during the guilt phase of trial. As an evidentiary principle, the concept of "opening the door" allows the admission of otherwise inadmissible testimony to "qualify, explain, or limit" testimony or evidence previously admitted. Tompkins v. State, 502 So.2d 415, 419 (Fla.1986); see Huff v. State, 495 So.2d 145, 150 (Fla.1986); Blair v. State, 406 So.2d 1103, 1106 (Fla.1981).
The concept of "opening the door" is "based on considerations of fairness and the truth-seeking function of a trial." Bozeman v. State, 698 So.2d 629, 631 (Fla. 4th DCA 1997). For example, in McCrae v. State, 395 So.2d 1145, 1151 (Fla.1980), defense counsel through his questions on direct examination "tactfully attempted to mislead the jury into believing that [the defendant's] prior felony was inconsequential." This Court held that to negate the misleading impression given by defense counsel's question, the prosecutor was entitled to elicit the nature of the prior felony conviction on cross-examination. See id. at 1152. The Court found that the defendant's
line of questioning could have deluded the jury into equating appellant's conviction of assault with intent to commit *580 murder with his previous misdemeanors. Consequently, the state was entitled to interrogate [the defendant] regarding the nature of his prior felony in order to negate the delusive innuendoes of his counsel.
Id. at 1152.
The phrase "opening the door" has been utilized interchangeably with the rule of completeness. See, e.g., Larzelere v. State, 676 So.2d 394, 402 (Fla.1996). The rule of completeness, however, is a separate evidentiary concept that falls within the general principle of door-opening. Codified at section 90.108, Florida Statutes (1995), the rule of completeness provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously." This rule has been applied to verbal statements as well. See Christopher v. State, 583 So.2d 642, 646 (Fla. 1991); see also Reese v. State, 694 So.2d 678, 683 (Fla.1997).
"Fairness is clearly the focus of this rule." Jordan v. State, 694 So.2d 708, 712 (Fla.1997). Thus, when a party introduces part of a statement, confession, or admission, the opposing party is ordinarily entitled to bring out the remainder of the statement. See Larzelere, 676 So.2d at 402; see also Christopher, 583 So.2d at 646. This rule is not absolute, and "the correct standard is whether, in the interest of fairness, the remaining portions of the statements should have been contemporaneously provided to the jury." Larzelere, 676 So.2d at 402. A good example of this principle is Walsh v. State, 596 So.2d 756, 757 (Fla. 4th DCA 1992), where the defendant opened the door to the admission of the codefendant's complete confession by asking questions on cross-examination designed "to glean select portions from [the codefendant's] statement which implicated the [codefendant] in the murder, but not [the defendant.]"
In this case however, the defendant did not elicit any portions or parts of Grimshaw's confession from the officer during cross-examination. Thus, the rule of completeness did not apply to permit the introduction of the details of Grimshaw's confession on redirect. Because the rule of completeness does not apply in this case, the appropriate inquiry here is whether based on considerations of fairness, the door was opened wide enough by defense counsel's questions to permit otherwise inadmissible and unreliable statements to be admitted into evidence. The "general unreliability of inadmissible evidence should be one of the court's considerations in determining whether fairness requires admission." Jordan, 694 So.2d at 712 (quoting Charles W. Ehrhardt, Florida Evidence § 108.1, at 35 (1995 ed.)).
In Pacheco v. State, 698 So.2d 593, 595 (Fla. 2d DCA 1997), the Second District found that the State was properly allowed to ask whether the codefendant had implicated the defendant because defense counsel's questions implied that only one other person incriminated the defendant. However the State went too far when it elicited details of the confession:
The detective's testimony and the taped statement, however, went well beyond the fact that [the codefendant] accused [the defendant] of participating in the crime. This evidence provided specific details about the commission of the offense, and it portrayed Pacheco as the instigator of the crime. [The defendant's] limited questions about Ms. Humphrey's role in his capture did not throw the door open wide enough to admit the entire confession of a codefendant who refused to testify. This evidence was inadmissible; it violated both the hearsay rule and the Confrontation Clause.
Id. at 595 (emphasis supplied). The Second District found that the only issue from cross-examination that warranted explanation was whether anyone else had led the *581 detective to suspect the defendant. Thus, the admission of the details of the codefendant's statement warranted reversal of the conviction. See id. at 595-96.
In this case, the limited questions by the defense counsel on cross-examination of the officer that needed to be clarified or explained on redirect were whether there was any other "evidence" that pointed to Ramirez as the individual who raped the victim or contradicted Ramirez's assertion that he acted at Grimshaw's direction. This inquiry opened the door only to allow the State to explain that Grimshaw's confession contradicted these assertions. It did not open the door to the questions on redirect regarding the details of what Grimshaw stated when Grimshaw was unavailable for cross-examination.
Further, the testimony about the contents of Grimshaw's statement was clearly inadmissible in the penalty phase where the state, again over objection, elicited even more highly inflammatory details of Grimshaw's confession. The State called one of the investigative detectives as the first penalty phase witness. He was asked to review for the jury the details of Grimshaw's confession, which included highly inflammatory statements that Ramirez verbally abused Grimshaw and threatened his life to secure his participation in the crime, anally raped the victim prior to her death, planned to set the victim's house on fire to destroy evidence, turned and smiled at Grimshaw after shooting the victim, and decided to kill the victim because she had seen his face. The State then used these hearsay statements against Ramirez to argue in support of the aggravating factors.
The State agrees that this "type of testimony is normally not admissible in the penalty phase." (Answer Brief at 28.) However, the State maintains that this testimony was admissible in this case because of the testimony concerning the confession previously allowed in the guilt phase. We disagree. As discussed previously, Ramirez's questions of the deputy did not open the door to the admission of the details of the confession during the guilt phase, much less to the additional graphic and damaging details admitted during the penalty phase. It is equally impermissible and violative of the defendant's constitutional rights in the penalty phase to allow the admission of the details of a non-testifying codefendant's confession where the defendant has not had an opportunity to confront or cross-examine that witness. See Gardner v. State, 480 So.2d 91, 94 (Fla.1985); see also Walton v. State, 481 So.2d 1197, 1200 (Fla.1985). Thus, even if we were not reversing for a new guilt phase, we would be compelled to reverse, at the very least, for a new penalty phase.

ERRORS IN THE SENTENCING ORDER
While declining to address proportionality at this time, we point to two deficiencies in the sentencing order.[10] First, the trial court gave Ramirez's age "little weight," despite the fact that Ramirez was only one month over the age of seventeen at the time of the crime, and even though there was uncontroverted evidence of his emotional, intellectual and behavioral immaturity. In addition, although the trial court acknowledged that Ramirez had no significant history of prior criminal activity, it found that this factor did not deserve "significant weight" because Ramirez had been prosecuted as a juvenile for a prior auto burglary.[11]
In regard to Ramirez's age the trial court found:

*582 At the time this murder was committed, the defendant was seventeen years old. Relevant expert testimony in this regard indicates that the defendant is more immature emotionally, intellectually and behavior-wise than his chronological age, but there was no evidence that he was, or is, in any way retarded or has a subnormal I.Q. The defendant's age at the time of he crime, while a mitigating factor, is given little weight.
We have explained that "age is simply a fact, every murderer has one." Echols v. State, 484 So.2d 568, 575 (Fla. 1985) (defendant was fifty-eight years old at the time of the crime). However, while we noted in Garcia v. State, 492 So.2d 360, 367 (Fla.1986), that the defendant's age of twenty, without more, was not significant mitigation, we have held that when the murder is committed by a minor, the mitigating factor of age must be found and given "full weight." Ellis v. State, 622 So.2d 991, 1001 n. 7 (Fla.1993) (emphasis supplied). "[T]he weight can be diminished by other evidence showing unusual maturity." Id. at 1001; see also Shellito v. State, 701 So.2d 837, 843 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998). Compare Mahn v. State, 714 So.2d 391, 400 (Fla.1998) (finding that the trial court abused its discretion in refusing to consider defendant's age of twenty as a statutory mitigating factor in light of the fact that Mahn had an "extensive, ongoing, and unrebutted history of drug and alcohol abuse, coupled with lifelong mental and emotional instability"); with LeCroy v. State, 533 So.2d 750, 758 (Fla.1988) (finding that the weight of the mitigating factor was diminished by Le-Croy's unusual mental and emotional maturity).
In this case there was no evidence to suggest unusual maturity such that the weight of this mitigator should have been diminished. See Ellis, 622 So.2d at 1001. To the contrary, the evidence revealed that Ramirez was immature for his age. Ramirez had the emotional, intellectual and behavioral maturity of a thirteen- or fourteen-year-old, and suffered from learning disabilities that evidenced an "organic problem" in his brain. Moreover, Ramirez's youth is linked not only with his emotional and intellectual immaturity, but also with his unrebutted history of "huffing."[12]See Mahn, 714 So.2d at 400; Urbin v. State, 714 So.2d 411, 418 (Fla.1998). Therefore, we find that the trial court abused its discretion in giving "little weight" to the defendant's age at the time of the crime, despite the uncontroverted testimony of defendant's emotional, intellectual and behavioral immaturity. See Shellito, 701 So.2d at 843; Ellis, 622 So.2d at 1001.
The trial court further erred in finding that the defendant's arrest as a juvenile for stealing a ten-dollar bill from the dashboard of a pick-up truck "militat[ed] against giving significant weight" to the mitigating factor that Ramirez had "no significant history of prior criminal activity." Adjudication on the juvenile arrest was withheld, and Ramirez successfully completed an alternative program. See supra note 4. The circumstances of the crime do not "militate against" giving this statutory factor "significant weight." The trial court abused its discretion in so finding. See Ellis, 622 So.2d at 1001.

CONCLUSION
In conclusion, we find that the confession given prior to the written waiver should have been suppressed. We further find that the trial court erred in allowing the details of the codefendant's confession in both the guilt and penalty phases of the trial because the cross-examination did not open the door to the details of the hearsay *583 statements of the non-testifying codefendant.
Accordingly, we reverse and remand for a new trial consistent with this opinion.
It is so ordered.
SHAW and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
ANSTEAD, J., concurs with an opinion, in which SHAW and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which HARDING, C.J., and OVERTON, Senior Justice, concur.
ANSTEAD, J., concurring.
The record in this case reflects a blatant violation of the United States Supreme Court's holding in Miranda v. Arizona,[13] as well as a violation of Florida's statutory and case law requiring the police to immediately notify a minor's parents when the minor is taken into custody. The police conduct involved herein essentially turns Miranda on its head by interrogating first, and then issuing the Miranda warnings and contacting the parents after the minor defendant has incriminated himself. For that reason, I fully concur in the majority's opinion, and especially its reliance upon the United States Supreme Court's decision in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). I write separately to emphasize that this case presents the precise scenario that the United States Supreme Court meant to protect against by adopting the Miranda rule, and that the Miranda violation was even more egregious here because the accused was a minor.
Initially, it is important to make clear that the circumstances surrounding the detention and interrogation of the minor defendant should be the focus for resolving the suppression issue, not the facts surrounding the murder, as suggested by the dissent. The senseless and tragic nature of the murder is conceded by all, but invoking the grisly circumstances of the murder only invites an emotional response and adds confusion to the legal issue of whether Ramirez' confession should have been suppressed.

CIRCUMSTANCES OF CONFESSION
It goes without saying that Ramirez' pre-Miranda statements are inadmissible. However, the initial confession secured in violation of Miranda and the circumstances under which it was given are of critical importance in determining the voluntariness and ultimately, the admissibility of the post-Miranda statements. Further, as the majority points out and as the dissent appears to agree, Ramirez was in custody at the time police interrogation commenced. In fact, as pointed out by the majority, the police had an extraordinary amount of evidence against Ramirez and hence, an abundance of probable cause to arrest him at the time they went to his home.
Indeed, it is doubtful that there could be more probable cause than existed here. Incredibly, the police not only had the codefendant's statement directly implicating Ramirez, but also a police-designed and controlled verification of Ramirez' involvement from Ramirez' own mouth during a controlled telephone conversation the police set up with the codefendant. Under those circumstances the police were not *584 free to avoid the strictures of Miranda by asserting "tongue-in-cheek" that they had no probable cause to believe Ramirez was involved in the murder.

PROBABLE CAUSE
The police first learned of Ramirez' involvement in the murder from Ramirez' co-felon, John Grimshaw, who confessed to the crime and also implicated Ramirez in the murder by identifying him as the actual shooter. The police followed up this confession by asking Grimshaw to call Ramirez while they secretly listened and controlled the conversation to verify Grimshaw's statement that Ramirez was involved. During the conversation, Ramirez inculpated himself by acknowledging familiarity with items stolen from the victims house: to wit, a gun, a couple of rings, and a pair of handcuffs. In other words, the staged conversation directly verified Grimshaw's statement to police implicating Ramirez.
Following the telephone conversation, and without any attempt to locate or notify Ramirez' parents, the police went right to Ramirez' house to obtain the stolen items and the murder weapon discussed in the staged conversation. At the time, Ramirez' parents were not home. Upon arrival, the police, without even a wink at Miranda, confronted Ramirez and asked him for the items taken from the victim's house. They also informed him of their knowledge about the telephone conversation with Grimshaw. In response, Ramirez actually handed over one of the stolen rings. The police then asked Ramirez to take them to the location of the weapon used in the murder and the remaining stolen items, again without any Miranda warnings and without notifying his parents. Finally, after obtaining the incriminating materials from Ramirez, and again without attempting to notify his parents, the police "asked" Ramirez to come to the police station.
Upon arrival at the police station, Ramirez was immediately placed in an interrogation room. Thereafter, without notifying Ramirez of his right to remain silent or his right to an attorney, and without informing him that anything he said could be used against him, or attempting to notify his parents, the police interrogated Ramirez about the murder. After Ramirez admitted his involvement in the murder, the police finally, but even then half-heartedly, informed him of his Miranda rights. The trap was now sprung, and the police led the minor defendant to inculpate himself before informing him of his rights and thus violated Miranda.

THE LAW
This case is controlled essentially by the rule set out in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), as well as the relevant Florida statutes governing parental notification when minors are taken into custody. Both the majority and dissenting opinion correctly cite Elstad for the proposition that a suspect who has once responded to unwarned, uncoercive questioning is not thereafter forever foreclosed from waiving his rights and confessing after he has been given the requisite Miranda warnings. See Elstad, 470 U.S. at 318, 105 S.Ct. 1285. Notwithstanding, the Court clearly stated that the subsequent statements may only be allowed when two important conditions are met: (1) the failure to administer the Miranda warnings was unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will; and (2) the unwarned statements are followed by a careful and thorough administration of the Miranda warnings. See id. at 309-11, 105 S.Ct. 1285 (emphasis added). In determining whether the post-Miranda statements were voluntarily made, the "surrounding circumstances and the entire course of police conduct with respect to the suspect" must be examined. Id. at 318, 105 S.Ct. 1285 (emphasis added). In reviewing the totality of the circumstances surrounding Ramirez's inculpatory statements, *585 it is painfully obvious that neither factor set out by the Elstad Court was met in this case.
Critically here, for example, at the time the mandated Miranda warnings were finally administered, Ramirez had already been directly implicated by Grimshaw, and had admitted possession of inculpatory evidence and specifically confessed to being present with Grimshaw in the victim's house on the night of the murder. The police did not warn Ramirez of his rights at any point in this carefully orchestrated trap, nor did they meaningfully attempt to contact his parents, despite the actual knowledge that Ramirez was a minor. Indeed, it is conceded that the police had spent approximately an hour interrogating Ramirez before asking him how his parents could be reached, and then, ironically, informing him that they were required by law to notify them or his guardian. It is against this factual backdrop that the Miranda issue must be resolved.
In applying the first prong of Elstad here, it is important to keep in mind what the police knew at the time Ramirez was asked to go to the police station. As noted above, Grimshaw had already implicated Ramirez as the shooter and the police had verified Ramirez' involvement through the telephone conversation between Grimshaw and Ramirez. When Ramirez was initially approached by the police, the police asked about but did not attempt to notify his parents. Ramirez was then placed in an interrogation room at a police station instead of a place more familiar to him, such as his home. More importantly, the police told Ramirez they knew that both he and Grimshaw had been involved and that they knew he was at the victim's house on the night of the murder. This evidence directly refutes the police story that Ramirez was only a possible witness at the time they picked him up and brought him in for interrogation. We must remember that the police had total control over the staged telephone conversation set up to verify Grimshaw's statement against Ramirez. Despite this, when Ramirez asked if he was under arrest, the detectives told him "no," even though, as previously stated, the police had an abundance of probable cause to arrest Ramirez at that time, and, indeed, he was never released from custody from that point on.
As to the second prong of Elstad, the dissent suggests that Elstad supports the admission of the subsequent confession in this case because there, the officers read Elstad his rights in much the same manner as the officers did in this case. See concurring and dissenting op. at 595, n. 20. However, a proper reading of Elstad clearly does not support such a conclusion. First, in Elstad, the pre-Miranda statements were made in a completely different setting than the setting in this case. There, the statements were made in the respondent's home with his mother several steps away in the kitchen. Second, Elstad's parents knew at all times what was happening and that he was being taken to the police station for interrogation.
Of even greater significance, however, is the Supreme Court's specific observation that the officers did not exploit the unwarned admission to pressure the defendant into waving his right to remain silent. See Elstad, 470 U.S. at 316, 105 S.Ct. 1285 (emphasis added). This case, in marked contrast, presents a blatant example of the police use of Ramirez' unwarned admissions to induce him to waive his rights and provide a more detailed confession. Immediately before the Miranda rights were read to Ramirez, Detective Jones purposefully minimized their significance and encouraged Ramirez to waive his rights by casually stating: "Why don't you let Nate know about his rights. I mean, he's already told us about going in the house and whatever. I don't think [the Miranda warnings are] going to change Nate's desire to cooperate with us." This was followed by a quick recitation, for the first time and in an off-handed manner, of Ramirez' rights.
*586 This purposeful sleight-of-hand passage over the Miranda hump (these rights aren't "going to change Nate's desire to cooperate with us."), was far from the "careful and thorough" administration of Miranda rights required by the Supreme Court in Elstad. In fact, the Elstad Court specifically stated that in that case the failure to read the Miranda rights initially could have been the result of confusion as to whether the brief exchange qualified as custodial interrogation, or it may have simply reflected the officer's reluctance to initiate an alarming police procedure before speaking to the mother. See id. at 315-16, 105 S.Ct. 1285. However, in the instant case, the record supports no other conclusion than a concerted effort to nail down Ramirez' involvement in the crime before giving any Miranda warning, followed by an attempt to keep him talking since he had already told them about his involvement. What good would it do to stop then?
There can hardly be a more compelling and coercive practice to induce further admissions than that person's own prior confession. "A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think that he has little to lose by repetition." Darwin v. Connecticut, 391 U.S. 346, 350, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (Harlan, J. concurring in part and dissenting in part). Moreover, any person who does not know that any statement made before the waiver is not admissible will logically think that it is much worse to assert the right to remain silent after having already confessed. Fittingly, the record reflects that it was not until Ramirez had orally waived his rights and given a lengthy and detailed description of the murder that the detective finally produced for the first time a written waiver and for the first time carefully and thoroughly explained the minor defendant's rights. Under Miranda, of course, this was a little late.

NOTIFICATION OF PARENTS
As pointed out by the majority, the police conduct involved here would be improper even if the subject involved had been an adult. Notwithstanding, the ultimate fact is that this case involves a minor, not an adult, and as such, it requires special care. See Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (holding that courts must take special care in scrutinizing the record in cases involving a confession by a juvenile). In Florida, the Legislature has gone to great lengths to provide special provisions and safeguards for minors who are taken into custody and who inevitably are at a greater risk to succumb to police influence and coercion. As part of these special provisions, Florida requires the police to immediately notify the parents of the child when taking the child into custody.
Specifically, section 39.037(2), Florida Statutes (1995), provides:
When a child is taken into custody as provided by this section, the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian, or legal custodian of the child is notified or the child is delivered to an intake counselor pursuant to s. 39.047, whichever occurs first. If the child is delivered to an intake counselor before the parent, guardian, or legal custodian is notified, the intake counselor or case manager shall continue the attempt to notify until the parent, guardian, or legal custodian of the child is notified.
This statute clearly requires that a person taking a child into custody shall initially and continuously attempt to notify the parents of that child. In the instant case, the officers clearly ignored the explicit provisions of this law. Although Detective Blum, who had gone to Ramirez' house, testified that he inquired where Ramirez' parents were when he first apprehended him, the videotape of the confession demonstrates *587 that the police did not even mention his parents again until almost an hour into the interrogation when he had already confessed to the murder. Further, since they told Ramirez that the law requires parental notification, we are not left to wonder whether these particular officers had actual knowledge of their legal obligations and simply chose to ignore them. Again, this is in contrast to Elstad, where the purpose of parental notification was clearly served since Elstad's mother was present and knew that her son was being taken in for questioning.
The United States Supreme Court in Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), a case dealing with the confession of a minor, declared that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 724, 99 S.Ct. 2560 (quoting Miranda, 384 U.S. at 475, 86 S.Ct. 1602). The determination whether the juvenile knowingly and intelligently waived his privilege requires courts to consider the "totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." Id. at 725, 99 S.Ct. 2560. This approach mandates
inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
Id. at 725, 99 S.Ct. 2560. After considering these principles, the Court held that Michael C. voluntarily waived his rights where the police conducting the interrogation had taken special care to ensure that the defendant understood his rights and had fully and carefully explained to the defendant that he was being questioned for murder. See id. at 726, 99 S.Ct. 2560. Further, there was no indication that the defendant was unable to understand his rights: he had considerable experience with the police, he was under full-time supervision with probation authorities, there was no indication that he possessed insufficient intelligence, and "[h]e was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." Id. at 726-27, 99 S.Ct. 2560.
The dissent's reliance on Fare is misplaced. The circumstances in Fare are clearly distinguishable and stand in stark contrast to what occurred here. First, the police in Fare apprised the juvenile of his rights and explained what those rights meant. Specifically, they told the juvenile "If you want to talk to us without an attorney present, you can. If you don't want to, you don't have to." Id. at 710, 99 S.Ct. 2560. More importantly, the juvenile in Fare had considerable experience with the police, had a record of several arrests, had served time in a youth camp and had been on probation for several years. See id. at 726, 99 S.Ct. 2560. In comparison, Ramirez' sole contact with the police prior to his arrest consisted of an admission of guilt and an "adjudication withheld" in juvenile court for taking ten dollars from the dashboard of a pick-up through an open window.
Under Miranda, the courts are ultimately responsible for ensuring that the police do not ignore a defendant's fundamental constitutional rights. In analyzing this issue, courts must never lose sight of the important policy clearly enunciated in the Supreme Court's opinion in Miranda:
[T]o respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.
*588 Miranda, 384 U.S. at 460, 86 S.Ct. 1602. In order to safeguard against this danger and ensure that any statement is freely made, the Court in Miranda required that the rendition of an accused's fundamental rights be given at the outset of any interrogation, not sometime thereafter when it is in the perceived best interest of the police to do so. See id. at 467-68, 86 S.Ct. 1602. Of course, the present case represents the exception since the overwhelming majority of police officers recognize their professional obligation to uphold the law and not demean it. For all of these reasons, I concur with the majority that in order to uphold the well-known law established in Miranda, Ramirez' confession must be suppressed.
SHAW and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
WELLS, J., concurring in part and dissenting in part.
I concur with part (2) of the majority opinion which concludes that the death sentence of Ramirez must be vacated in favor of a new penalty phase proceeding because of the error in allowing the detective's testimony as to John Grimshaw's statements. See Franqui v. State, 699 So.2d 1332 (Fla.1997). I express no opinion with respect to part (3) of the majority opinion, as I find the issues raised in that portion of the majority opinion to be moot.
I dissent from part (1) which concludes that the trial court committed legal error in denying Ramirez's motion to suppress a pretrial confession. The trial court found that a detective read Ramirez his Miranda rights; that Ramirez made a valid waiver of these rights; and that after waiving his rights Ramirez voluntarily made inculpatory statements. I find no reason to disturb this judgment. After reviewing the record of the hearing on the motion to suppress, including the videotape of Ramirez's confession, I have come to the inescapable conclusion that the detectives acted in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny.

I. Factual Background
The majority omits all but a summary factual statement of this burglary, rape, kidnapping, and, finally, murder of Mildred Boroski, a septuagenarian widow. A detailed version of the criminal episode and the events leading to the interrogation is necessary to place the conduct of the detectives who interviewed Ramirez into context. This criminal episode took place between midnight and 7 a.m. on March 11, 1995. The two participants in the crime were John Grimshaw and Ramirez, both age seventeen at the time of the crime and the subsequent police interrogation. Grimshaw was the elder of the two.
Ms. Boroski lived alone in a retirement village in Pasco County. Her late husband had been a police chief in the state of Ohio. Ms. Boroski had a .38 caliber service revolver and a pair of handcuffs; both had belonged to her husband. She kept both the revolver and the handcuffs in her bedroom. Grimshaw lived in a house across the street from Ms. Boroski. Ramirez lived with his father and stepmother in the same retirement village as Ms. Boroski.
At around midnight on March 11, 1995, Grimshaw and Ramirez climbed over a fence into Ms. Boroski's backyard and cut the exterior phone lines. Next, they cut through a screen door and gained access to a porch. Ramirez then broke the glass out of a window with the use of a crowbar. Grimshaw and Ramirez, both wearing gloves, climbed into the house through this window.
Ramirez took a knife from one of the drawers in the kitchen. When the two went into the room where Ms. Boroski was sleeping, her small dog started barking and came at Ramirez. Ramirez hit the dog with the crowbar he was carrying. The force of the blow killed the dog instantly, causing it to defecate all over the room. Ms. Boroski awoke. Grimshaw told her to shut up and then tied Ms. Boroski, who was lying on her stomach, to *589 the bed with phone cords. Ramirez assisted in restraining Ms. Boroski.
Grimshaw took two rings Ms. Boroski was wearing. Ramirez took the gun and the handcuffs which were in Ms. Boroski's bedroom. Ramirez stated that Grimshaw then raped Ms. Boroski. The duo then placed Ms. Boroski in her car along with her dead dog. Ramirez, along with Grimshaw, drove that car to an open field. Once at the open field, they marched Ms. Boroski approximately 200 feet into the field, where she was told to lie down. Ramirez fired two shots into Ms. Boroski's head, killing her.
Grimshaw and Ramirez then drove Ms. Boroski's car into a wooded area and walked back to Grimshaw's house. Ramirez threw the keys to the car into a lake, and the keys were later found by a person fishing. Ramirez hid the gun used to murder Ms. Boroski under the mattress of his waterbed. Ramirez's stepmother discovered the gun as well as a second gun. Ramirez's father told him he did not want the guns in the house, so Ramirez temporarily gave the guns to a friend named Rodney. Rodney, who was on probation, reluctantly accepted the guns. Ramirez gave the handcuffs to his girlfriend. In addition to the rings, Grimshaw and Ramirez took a few dollars and some change from Ms. Boroski's purse. The two spent the money on video games the next day.
Ms. Boroski's car was located on March 11, 1995. A deputy sheriff went to Ms. Boroski's home the next day and discovered signs of the forced entry. Upon entering the home, the deputy noticed that every telephone was either missing or disconnected. The bedroom had been ransacked. There was evidence of blood and fecal matter. A crime team was dispatched to the house. Grimshaw saw the crime team and approached one of the crime technicians, offering to help the investigators search for Ms. Boroski. Grimshaw led investigators on a search that lasted a couple of hours, but the body was not located.
Ms. Boroski's body was discovered on March 14, 1995. Ms. Boroski was lying on her back with a pillow under her head and another on top of her head. A pillow case was covering her head. She was barefoot and wearing a white nightgown. The nightgown was hiked up above her genital area, and her underwear was cut around the crotch area. Her wrists were bound with what was identified as two different types of telephone cord. Her anal and vaginal areas showed bruising consistent with a sexual assault.
Grimshaw soon thereafter became a suspect in the investigation. On May 3, 1995, Grimshaw was taken into custody and interviewed at the Sheriff's office for more than five hours. Grimshaw gave varying accounts of what transpired on the morning of March 11, 1995. He told a detective that Ramirez had some of Ms. Boroski's property. To verify this allegation, police had Grimshaw call Ramirez. The conversation was recorded by investigators.
In the recorded telephone conversation, Ramirez acknowledged possessing some of Ms. Boroski's property:
[Grimshaw:] You didn't happen to get that gun back from Ronnie, did you?
[Ramirez:] Not yet.
. . . .
[Grimshaw:] ... Did you ever give that ring to Christy [Ramirez's girlfriend] yet?
[Ramirez:] No. It won't fit her.
. . . .
[Ramirez:] ... I don't know where the single-stone ring is. I lost that one. The one with the three stones in it, I have that....
. . . .
[Grimshaw:] The handcuffs[?]
[Ramirez:] Christy got those.
Following this conversation, Detective Blum was dispatched to Ramirez's home to retrieve the property and to have Ramirez brought down to the Pasco County Sheriff's Office. The lead detective affirmatively *590 testified that, before sending Detective Blum to Ramirez's home to retrieve the property, he did not consider Ramirez a suspect in Ms. Boroski's murder. He sent Detective Blum to retrieve the stolen property and to find out what information Ramirez had.
Detective Blum testified that he went to the home and informed Ramirez that he had been instructed to pick up certain items that Grimshaw had placed in his custody: namely, two rings, a set of handcuffs, and a firearm. Ramirez was hesitant at first. The detective told Ramirez that the conversation between himself and Grimshaw had been recorded. Ramirez then surrendered one ring and stated that the other ring was lost. Ramirez told the detective that he had given the handcuffs to his girlfriend and that he had given the firearm to a friend. The detective, along with Ramirez, retrieved the handcuffs from Ramirez's girlfriend and the firearm from Ramirez's friend.
Detective Blum testified that he inquired from Ramirez as to the location of his parents and was told by Ramirez that his parents were at work. When Ramirez arrived at the sheriffs office, he was taken to an interrogation room, where he was immediately interviewed.[14] The entire interview, which lasted two hours, was videotaped. The videotape of the confession was introduced at the suppression hearing.
Ramirez was interviewed by Detectives Bousquet and Jones, Bousquet being the predominant interrogator. Bousquet testified that he did not read Ramirez his Miranda rights at the very beginning of the interview because at that time Ramirez was not a suspect. Approximately five minutes into the interview, after Ramirez admitted in conclusory fashion to being in Ms. Boroski's home on the night of the murder but before admitting to killing her, Bousquet warned Ramirez of his Miranda rights.[15] It was not until after Bousquet read Ramirez his rights and after Ramirez acknowledged that he still wanted to speak with the detectives that Ramirez discussed in detail how he and Grimshaw broke into Ms. Boroski's home, killed Ms. Boroski's dog, tied Ms. Boroski to her bed, raped Ms. Boroski, stole her property, kidnapped Ms. Boroski, and then, finally, marched Ms. Boroski 200 feet into an open field and shot her twice in the head. After going through an initial version of the episode, Ramirez was asked to sign a voluntary waiver for a search of his room in his house and a written waiver of his Miranda rights. Ramirez signed both documents and thereafter continued with more sordid details about the criminal episode.
At the hearing on the motion to suppress, the trial court heard live testimony from Detective Blum and Detective Bousquet and viewed the videotape of the interview. At the end of the evidence and argument, the trial judge denied Ramirez's motion to suppress:
It appears to the Court that at first, this defendant was a potential witness to the Grimshaw case, and as soon as it appears that he might have some involvement, they quickly gave him Miranda. At all times during his questioning, he spoke clearly and logically and did not appear to be under any stress.

*591 The striking is characterized by the defense attorney. I'll agree it could be called slapping. I don't think it was that prevalent. I think you can analogize it to a coach encouraging one of the kids on his baseball team by whacking him on the butt or whatever, as kind of a form of encouragement. Obviously, the methodology used here by Detective Bousquet was to appear as a friend, and I think he carried that part of his role out very well.
They got water for this young man, they offered to get him some food at one point. He even put his arms around him after the young man had made his confession, so to speak. I think there may have been some genuine sympathy shown by the detective. I'dno one likes to see a young boy get into trouble, but this is a very serious charge.
I saw no sign of what I would call abuse. This young man at no time appeared to be in fear or suffering in any way.
As far as Miranda, I agree the original Miranda could have been done more thoroughly, but I think at that point, it was done just to protect themselves because it appeared it mightcould be that man could be implicated. And his physical affirmation and his verbal affirmation is as good as you'll find in most cases. The written affirmation is, and the consent to search later on, might even be superfluous. They certainly had enough information to get a search warrant if they wanted it without getting the consent signed by the young man.
The Court's impressed that this young man seems pretty clear-headed and seems to know pretty well what was going on during this. And then after he realized that he was in hot water, then he first kind of got sad, you might say. But I'll deny the motion to suppress.

II. Discussion

A. The Law on Confessions
Beginning in 1936 with Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), the Supreme Court judged the admissibility of confessions in state courts under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Wayne Lafave & Jerold H. Israel, Criminal Procedure § 6.1(c) at 292 (2d ed.1992). The Court employed a totality-of-the-circumstances review of the record to determine whether the confession had voluntarily been given. See id.; see also Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Chambers v. Florida, 309 U.S. 227, 228-29, 60 S.Ct. 472, 84 L.Ed. 716 (1940).
The Court in Miranda, relying upon the Self-Incrimination Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment,[16] held that statements made by a defendant during a custodial interrogation are inadmissible unless the defendant is informed of certain rights and freely decides to waive those rights.[17] The prophylactic Miranda rights are "`not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" New York v. Quarles, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (quoting from Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974)).
In reviewing the validity of a waiver, courts must utilize the same totality of the circumstances review used to determine *592 whether a confession itself is voluntarily given. See Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); Sliney v. State, 699 So.2d 662, 668 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998). "The totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Moreover, an express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver but is not inevitably either necessary or sufficient to establish waiver. North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
The Supreme Court also has held that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings. Oregon v. Elstad, 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In Elstad, the Supreme Court rejected the argument that the traditional exclusionary rule applicable to "fruits" of unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution is applicable to situations in which police officers during a custodial interrogation solicit incriminating statements without first advising the defendant of his Miranda rights.
Relying on Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (voluntary statements solicited from defendant in violation of Miranda may nevertheless be used to impeach defendant on cross-examination), and Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (evidence secured by statements obtained in violation of Miranda does not render evidence inadmissible per se), the Court reasoned that it would be an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Elstad, 470 U.S. at 307-09, 105 S.Ct. 1285.

B. Totality of the Circumstances Review
The majority opinion does not conclude that Miranda warnings were not given, as they were plainly shown on the videotape as having been given not once but twice, or that the confession itself was involuntary. Rather, the thrust of the majority's decision to suppress Ramirez's pretrial confession is based on a conclusion that the mannerisms of the lead detective, in light of Ramirez's age, rendered Ramirez's waiver of his Miranda rights involuntary. The record is devoid of any evidence whatsoever which would tend to support this conclusion.[18]
The State has the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of Miranda; the State need prove waiver only by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167-68, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Sliney, 699 So.2d at 668.[19] I conclude that *593 a fair and accurate review of the police investigation into this crime and the videotape of Ramirez's confession shows by a preponderance of the evidence no "lawless" or coercive conduct by the police so as to require that this otherwise indisputably voluntary confession be found inadmissible on the basis of an invalid waiver. See Connelly, 479 U.S. at 166-67, 107 S.Ct. 515. This was the clear decision of the trial judge at the suppression hearing, which I accept as to the facts and approve as to the law.
The concurring opinion accuses law enforcement of "purposeful sleight-of-hand passage over the Miranda hump." Concurring op. at 586. The majority states that in contrast to Elstad, "[w]hen the police finally administered the Miranda warnings [to Ramirez], the administration was not careful and thorough. To the contrary, there was a concerted effort to minimize and downplay the significance of the Miranda rights." Majority op. at 575. The apparent basis for these unwarranted statements stems from the colloquy between the detectives and Ramirez before Detective Bousquet read Ramirez his rights:
[Detective Jones:] Why don't you let [Ramirez] know about his rights. I mean, he's already told us about going in the house and whatever. I don't think that's going to change [Ramirez's] desire to cooperate with us.
[Detective Bousquet:] I'll go through all that with [Ramirez]. [Ramirez], I'm going to read you your rights and go through the case.
[Ramirez:] I have a question. Am I like being placed under arrest?
[Detective Bousquet:] No. I'm reading you your rights. [Ramirez], you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him be present while you're being questioned. If you can't afford to hire a lawyer, one will be appointed to represent you during questioning, if you wish, if you decide, at any time to exercise your rights and not answer any questions or make any statements.
... [D]o you understand these rights as I've explained them to you?
[Ramirez:] (Indicating affirmatively).
[Detective Bousquet:] Having these rights in mind, do you wish to speak to me now about the case?
[Ramirez:] I guess. That's what I'm here for.
After Detective Bousquet warned Ramirez that he had the right to remain silent and had the right to counsel and after Ramirez affirmatively indicated that he did not wish to invoke these rights, Ramirez detailed the facts of this criminal episode.
In its analysis, the majority states that the instant case stands "in sharp contrast" to Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), a case in *594 which the Supreme Court reviewed the validity of a Miranda waiver by a juvenile defendant. Contrary to the majority, I find that the two cases are fairly similar and that Fare supports affirmance, not reversal, of the trial court's order. In Fare, the juvenile defendant, who was sixteen and one-half years old at the time of his interrogation, challenged a ruling denying his motion to suppress a confession on the basis that his waiver of Miranda was the product of police coercion. The Supreme Court rejected this argument.
The following colloquy taken from the state court opinion represents the extent of the defendant's waiver of his Miranda rights:
On February 4, 1976, police interrogated defendant at the Van Nuys police station. After advising defendant of his Miranda rights, the police interrogating officer continued the conversation as follows:
Q.... Do you understand all of these rights as I have explained them to you?
A. Yeah.
Q. Okay, do you wish to give up your right to remain silent and talk to us about this murder?
A. What murder? I don't know about no murder.
Q. I'll explain to you which one it is if you want to talk to us about it.
A. Yeah, I might talk to you.
Q. Do you want to give up your right to have an attorney present here while we talk about it?
A. Can I have my probation officer here?

Q. Well I can't get a hold of your probation officer right now. You have the right to an attorney.
A. How I know you guys won't pull no police officer in and tell me he's an attorney?
Q. Huh?
A. (Repeat of last answer.)
Q. Your probation officer is Mr. Christiansen.
A. Yeah.
Q. Well I'm not going to call Mr. Christiansen tonight. There's a good chance we can talk to him later, but I'm not going to call him right now. If you want to talk to us without an attorney present, you can. If you don't want to, you don't have to. But if you want to say something, you can, and if you don't want to say something you don't have to. That's your right. You understand that right?
A. Yeah.
Q. Okay, will you talk to us without an attorney present?
A. Yeah I want to talk to you. (Emphasis added.)
In re Michael C., 21 Cal.3d 471, 146 Cal. Rptr. 358, 579 P.2d 7, 8 (1978), reversed, Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).
In analyzing the issue of waiver, the Supreme Court stated that the totality of the circumstances test used for adults was to be used with juvenile confessions as well. The Court included the following factors for consideration, "the juvenile's age, experience, education, background, and intelligence." Id. at 725, 99 S.Ct. 2560. After considering the relevant factors, the Supreme Court concluded:
We feel that the conclusion of the Juvenile Court was correct. The transcript of the interrogation reveals that the police officers conducting the interrogation took care to ensure that respondent understood his rights. They fully explained to respondent that he was being questioned in connection with a murder. They then informed him of all the rights delineated in Miranda, and ascertained that respondent understood those rights. There is no indication in the record that respondent failed to understand what the officers told him. Moreover, after his request to see his probation officer had been denied, and *595 after the police officer once more had explained his rights to him, respondent clearly expressed his willingness to waive his rights and continue the interrogation.
Further, no special factors indicate that respondent was unable to understand the nature of his actions. He was a 16½-year-old juvenile with considerable experience with the police. He had a record of several arrests. He had served time in a youth camp, and he had been on probation for several years. He was under the full-time supervision of probation authorities. There is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be. He was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.
On these facts, we think it clear that respondent voluntarily and knowingly waived his Fifth Amendment rights.
Id. at 726-27, 99 S.Ct. 2560.
A review of the videotape reveals that there is no material difference between the way the officers in Fare administered the Miranda warnings and secured a waiver and the way the detectives in the instant case accomplished the same.[20] In an attempt to distinguish Fare, the majority makes an incredulous leap of logic in stating that Detective Jones' statement, "I mean, he's already told us about going in the house and whatever. I don't think [the Miranda warnings are] going to change [Ramirez's] desire to cooperate with us," somehow renders an otherwise voluntary confession inadmissible because it minimizes the significance of Miranda. As in Moran, the record here "is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements." Moran, 475 U.S. at 421, 106 S.Ct. 1135.
In Colorado v. Connelly, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the Supreme Court stated that "[t]he voluntariness of a waiver of [the Miranda] privilege has always depended on the absence of police overreaching, not on `free choice' in any broader sense of the word." The record in no way supports the factually baseless assertion that Ramirez's waiver was the product of "police overreaching" or "cajoling" or "trickery." Rather, the record contains competent, substantial evidence to support the trial court's legal conclusions. See Escobar v. State, 699 So.2d 984, 987 (Fla.1997).
I do not understand what more the majority would have required of Detectives Bousquet and Jones. As Justice Kogan wrote for a unanimous Court in Johnson v. State, 660 So.2d 637 (Fla.1995):
Police are not required to disclose every possible ramification of a waiver of rights to a detainee apart from those general statements now required by Miranda and its progeny. Nor are police required to tell detainees what may be in their personal best interests or what decision may be the most advantageous to them personally. Under our system, law enforcement officers are representatives of the state in its efforts to maintain order, and the courts may not impose upon them an obligation to effectively serve as private counselors to the accused. The latter is the obligation of private attorneys or public defenders and certainly must not be shouldered by those whose job it is to police our streets.
Id. at 642. It is very significant to this analysis that the interview of Ramirez was videotaped. This is a fact which should militate against exclusion of the evidence. Such videotaping ensures *596 against extracting confessions by way of physical or psychological coercion, which is what the constitution prohibits. To exclude this confession because of the mannerisms used by the detectives in the interview, which can only be categorized as valid police techniques, will only serve to deter the videotaping of such interviews, which is contrary to the reasoning underlying the exclusionary rule.[21]
The majority decision also relies heavily on the fact that Ramirez was only seventeen at the time of the interrogation, he had limited experience with the criminal justice system, and his parents were not notified before the interrogation began. Majority op. at 577. I point out that the record reflects that on September 23, 1993, Ramirez was arrested and charged with burglarizing an automobile. Ramirez entered an admission of guilt and spent four days in secure detention, after which he was placed in home detention. Ramirez was also required to attend six sessions of a seminar entitled the "Consequences of Crime." How many arrests must a juvenile have before the majority of this Court would hold that the defendant is experienced in the criminal justice system? This opinion in reality creates considerable uncertainty as to whether a juvenile may validly waive his or her Miranda rights. Such an opinion is contrary to this Court's precedent in Doerr v. State, 383 So.2d 905, 907-08 (Fla.1980).
Moreover, there is no basis to refuse to accept Ramirez's statement of waiver as reflected in the videotape because in the middle of the second reading to him of the Miranda rights, Ramirez interrupted the reading and said, "I understand it." The detective continued with the complete reading of the rights despite the fact that the videotape reflects an unequivocal statement by Ramirez that he already understood his rights. Ramirez's demeanor throughout the interview shows that he understood his rights.
The majority also places heavy stock in the fact that the detectives were not able to notify Ramirez's parents before the interrogation. Section 39.037(2), Florida Statutes (1995), states in pertinent part: "When a child is taken into custody as provided in this section, the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child." (Emphasis added.)[22] In Doerr v. State, 383 So.2d 905 (Fla.1980), we held under a substantially similar provision that "[l]ack of notification of a child's parents is a factor which the court may consider in determining the voluntariness of any child's confession, but is not a statutory prerequisite to interrogation." Id. at 908. What this section requires is a reasonable attempt to notify a juvenile's parents in light of the attending circumstances.
Unexplainably, the majority states: "The State maintains that some attempts *597 were made to contact Ramirez's parents earlier. However, the statute would be rendered meaningless if all that is required are perfunctory attempts to contact a juvenile's parents." Majority op. at 578. To label the State's attempts to find out from Ramirez where his parents could be located as "perfunctory" ignores the sworn testimony in the record and the videotape which establish that questions were asked of Ramirez as to his parents' location, to which questions Ramirez answered he did not know. The trial court found, based upon the testimony of the detectives, that Ramirez's interrogation began as an inquiry as to Ramirez's knowledge as a potential witness. The majority ignores this finding of historical fact by the trial judge. This Court is not at liberty, according to its precedent, to reject factual findings by a trial court absent a finding of an abuse of discretion. Escobar v. State, 699 So.2d 988, 993 (Fla.1997). Moreover, Detective Blum, who went to Ramirez's house, testified that he tried to learn from Ramirez where his parents could be located. The majority ignores this testimony as well. In fact, at the end of the interrogation when the police again tried to learn his parents' whereabouts, Ramirez was not helpful. The detectives acted as diligently as possible under the circumstances of this case.
Finally, the majority relies on the fact that Detective Bousquet "belatedly" obtained a written waiver from Ramirez. Under Florida law, a written waiver is but a factor to be considered in a totality of the circumstances review. See Sliney v. State, 699 So.2d 662 (Fla.1997). The purpose of a waiver is to ensure that a defendant understands the rights he is waiving. In an instance in which there is no videotape, a written acknowledgment of the Miranda rights substantiates the fact that there was a reading of the rights and an affirmative statement that the interrogation voluntarily proceeded following the reading. The videotape here plainly illustrates that the Miranda rights were read and that Ramirez agreed to proceed notwithstanding. In Sliney there was no such video-only the testimony of two police officers-and failure to obtain the written waiver was not fatal to the admissibility of the confession. Id. at 669. Certainly, in this case, failure to obtain an initial written waiver should not be fatal to admissibility in light of the videotape.
In sum, the totality of the factors here do not show police overreaching. The situation here is that the police investigation into the brutal murder of Ms. Boroski led law enforcement to Ramirez as having possession of some of the widow's property. It was certainly reasonable for law enforcement to attempt to obtain information as to how Ramirez came into possession of the property. A viewing of the videotape belies the impression left by the majority opinion that the interrogation went on a long time before Ramirez was read his rights. The videotape further belies the impression left by the majority opinion that any undue physical or psychological coercion was used in this investigation.
Certainly, most criminal suspects would be better advised not to waive their Miranda rights, but our cases permit waiver because the Courts recognize that admissions of guilt are essential to society's compelling interest in finding, convicting, and punishing those who violate the law. Moran, 475 U.S. at 424, 106 S.Ct. 1135; see Traylor v. State, 596 So.2d 957, 965 (Fla. 1992). As Justice Frankfurter stated almost four decades ago:
Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains-if police investigation is not to be balked before it has fairly begun-but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it. *598 Culombe v. Connecticut, 367 U.S. 568, 571, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Ramirez, for whatever undisclosed reason he had in his own mind, told the detective the truth of what occurred in the criminal episode. Excluding the instant confession is not in the interests of society or justice. On the other hand, the majority places the interest of society in having this abhorrent crime punished in substantial and unnecessary peril.
HARDING, C.J., and OVERTON, Senior Justice, concur.
NOTES
[1] Grimshaw's conviction and life sentence were per curiam affirmed. See Grimshaw v. State, 704 So.2d 529 (Fla. 2d DCA 1997). Grimshaw was several months older than Ramirez, one grade ahead of him, and had a history of more extensive disciplinary problems, including allegations of inappropriate sexual advances against older women.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Although "our analysis in Traylor [v. State, 596 So.2d 957 (Fla.1992),] was grounded in the Florida Constitution, our conclusions were no different than those set forth in prior holdings of the United States Supreme Court." State v. Owen, 696 So.2d 715, 719 (Fla.1997).
[4] It would appear that Ramirez had very limited experience with either the adult or juvenile justice system. Ramirez indicated in his confession that he had been involved in a couple of fights at school. In 1993, when Ramirez was fifteen, he was arrested for taking ten dollars from the dashboard of a pickup truck through an open window. Adjudication was withheld, and he was placed in an alternative program including counseling and community service, which he successfully completed.
[5] We are aware of testimony from the penalty phase that although Ramirez was seventeen, he had learning disabilities and was performing academically at an eighth or ninth grade level. He had an emotional, intellectual and behavioral age of thirteen or fourteen. However, this evidence was not offered at the suppression hearing, and for that reason we do not consider it in our analysis on this issue. See Escobar v. State, 699 So.2d 984, 987 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998).
[6] The current version of this subsection is now located at subsection 985.207(2), Florida Statutes (1997).
[7] Although Doerr v. State, 383 So.2d 905 (Fla. 1980), was decided under superseded law, see § 39.03(3)(a), Fla. Stat. (1975), the statutory language is "sufficiently similar" to the statute applicable in this case that Doerr's holding "still obtains." Allen v. State, 636 So.2d 494, 496 n. 2 (Fla.1994).
[8] The record reflects that Ramirez's parents came to the station house after Ramirez's confession, apparently responding to a message left on their telephone answering machine at home. The record is unclear about any other attempts to contact Ramirez's parents. At the hearing on the motion to suppress, the sheriff's deputy who went to Ramirez's home testified on cross-examination that he knew Ramirez was a minor and asked him where his parents were and how they could be contacted. His testimony does not indicate when this question was asked nor does his testimony at the motion to suppress indicate any response from Ramirez. The videotape reveals that it was only after Ramirez confessed to the crime that the detectives begin to question Ramirez in earnest about the whereabouts of his parents, who both worked for a nursing agency.
[9] Although in Franqui v. State, 699 So.2d 1312, 1318 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1337, 140 L.Ed.2d 499 (1998), cert. denied, ___ U.S. ___, 118 S.Ct. 1582, 140 L.Ed.2d 796 (1998), the codefendants were tried jointly,

[t]he fact that the defendants here were tried separately rather than jointly does not vitiate the constitutional infirmity [of admitting the statements of a non-testifying codefendant without allowing the defendant to cross-examine the declarant.] The crux of a Bruton violation is the introduction of statements which incriminate an accused without affording him an opportunity to cross-examine the declarant.
Nelson v. State, 490 So.2d 32, 34 (Fla.1986) (quoting Hall v. State, 381 So.2d 683, 687 (Fla.1978)) (emphasis supplied).
[10] We reject Ramirez's contention in his third point on appeal that there was insufficient evidence to support the finding that the murder was cold, calculated and premeditated (CCP), and that the aggravating circumstances of commission to avoid arrest and CCP had to be merged. See Jennings v. State, 718 So.2d 144 (Fla.1998); Stein v. State, 632 So.2d 1361 (Fla.1994).
[11] See supra note 4.
[12] According to testimony, "huffing" is the inhalation of chloroflouorocarbons from an aerosol or spray pain can to produce a sensation of being "high." An empty aerosol can was found near the vehicle involved with the crime. There was substantial uncontroverted evidence that Ramirez engaged in huffing during the months before the murder.
[13] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Every professional law enforcement officer is aware that the first thing the police must do in confronting a defendant is to "read him his Miranda rights." Indeed, the professional practice has become so institutionalized that all police officers are provided with Miranda cards which contain those rights. Before any interrogation can occur, police officers must carefully apprize the defendant again of his Miranda rights to ensure that any subsequent confession will not be suppressed if Miranda is not followed. In other words, all professional officers know that they are not allowed to interrogate first and tell a defendant of his rights afterwards.
[14] The majority states, "Once transported to the station, Ramirez was placed in a small room and questioned by two other detectives." Majority op. at 572. The videotape belies the impression left by this statement. The interrogation room appears to be a rather normal size interrogation room. Although two detectives were often in the room, only one of the detectives actually questioned Ramirez. The second detective asked minimal questions other than in an attempt to locate Ramirez's parents.
[15] I do not agree with what I consider to be the harsh criticism in the concurring opinion of law enforcement conduct. Rather, I believe that law enforcement's use of videotape for this interview is procedure which should be encouraged and is a demonstration of good faith on the part of law enforcement. The trial court viewed this tape and reached a conclusion precisely to the contrary of the majority and Justice Anstead after also having the benefit of the live testimony of the officers.
[16] See Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).
[17] Before a custodial interrogation may begin, police must inform the suspect that he has the right to remain silent, that anything he says can and will be used against him in court, that he has the right to have a lawyer with him during interrogation, and that, if he is indigent, a lawyer will be appointed to represent him. Miranda, 384 U.S. at 479, 86 S.Ct. 1602.
[18] It is difficult to understand whether the majority's decision is that the manner in which Bousquet administered the initial Miranda warnings rendered the initial waiver involuntary as a matter of law or whether the majority's decision is that the trial judge's determination that the waiver was voluntary was not based on competent, substantial evidence. In either event, the majority's opinion in this regard has no basis in fact or law. The majority recedes, sub silentio, from the long-standing rule of this Court that a trial court's ruling on a motion to suppress is presumptively correct. Escobar v. State, 699 So.2d 984, 987 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1548, 140 L.Ed.2d 695 (1998); Medina v. State, 466 So.2d 1046, 1049 (Fla. 1985).
[19] I take issue with the following statement by the majority:

Moreover, where a confession is obtained after the administration of Miranda warnings, the State bears a "heavy burden" to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel, especially where the suspect is a juvenile. Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).
Majority op. at 575. To say that a party which bears the burden of production or the burden of proof by the preponderance of the evidence standard carries a "heavy burden" is a non sequitur. The more complete statement from Connelly states:
Although we have stated in passing that the State bears a "heavy" burden in proving waiver, we have never held that the "clear and convincing evidence" standard is the appropriate one.
. . . .
We now reaffirm our holding in Lego [v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)]: Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence.
Connelly, 479 U.S. at 167-68, 107 S.Ct. 515 (emphasis added; citations omitted).
[20] The majority's statement that Elstad requires reversal is similarly strange. That opinion shows that the officers read Elstad his Miranda rights and secured a waiver in much the same fashion as did the detectives in the instant case. Elstad, 470 U.S. at 315 n. 4, 105 S.Ct. 1285.
[21] In Connelly, the Supreme Court stated:

We have also observed that "[j]urists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." ... The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution.
Connelly, 479 U.S. at 166, 107 S.Ct. 515 (quoting United States v. Janis, 428 U.S. 433, 448-49, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)).
[22] Section 39.037(2), Florida Statutes (1995), provides:

(2) When a child is taken into custody as provided in this section, the person taking the child into custody shall attempt to notify the parent, guardian, or legal custodian of the child. The person taking the child into custody shall continue such attempt until the parent, guardian, or legal custodian of the child is notified or the child is delivered to an intake counselor pursuant to s. 39.047, whichever occurs first. If the child is delivered to an intake counselor before the parent, guardian, or legal custodian is notified, the intake counselor or case manager shall continue the attempt to notify until the parent, guardian, or legal custodian of the child is notified.