983 So.2d 731 (2008)
The STATE of Florida, Appellant,
v.
Jesus ROMAN, Appellee.
No. 3D06-1949.
District Court of Appeal of Florida, Third District.
June 11, 2008.
Bill McCollum, Attorney General, and Angel L. Fleming, Assistant Attorney General; Katherine Fernandez Rundle, State Attorney, and Christine E. Zahralban, Assistant State Attorney, for appellant.
Bennett H. Brummer, Public Defender, and David S. Markus, Special Assistant Public Defender, for appellee.
Before COPE, RAMIREZ, and SALTER, JJ.
RAMIREZ, J.
The State appeals a pretrial ruling suppressing statements made by defendant Jesus Roman (then a minor) to police. Roman and four adult co-defendants were charged in a seven-count indictment with first-degree murder, attempted first-degree murder with a deadly weapon, kidnapping with a weapon, armed robbery with a firearm, and armed sexual battery. Roman gave a detailed statement to the police describing the events surrounding the crime. The entire statement was recorded, as well as the pre-statement interview. We reverse because Roman freely executed a Miranda[1] rights waiver form, *732 and both the recording and the testimony at the motion to suppress indicated that he knowingly, voluntarily, and sufficiently waived his rights.

I. Pertinent Facts Relating to the Pretrial Statement

Most of the facts regarding Roman's pretrial statement are not in dispute. On the night of Saturday, April 27, 2002, young adults Ana Maria Angel and Nelson Portobanco had a dinner date in Miami Beach. They walked on the beach at the south end of the city and, as they returned from that walk, were abducted at gunpoint by a group of young men in a white pickup truck.
Ana Maria Angel was assaulted, raped, and ultimately shot in the head at point blank range while on her knees. Nelson Portobanco was beaten, stabbed, and left for dead alongside Interstate 95 as the kidnappers drove north in the pickup truck.
Using information obtained from Portobanco at North Broward Hospital, credit card and ATM information, and cell phone details, a Miami Beach homicide detective traced the suspects to an apartment complex in Orlando early Sunday morning. Florida Department of Law Enforcement (FDLE) personnel in Orlando were brought into the investigation. During the questioning of persons other than Roman, the investigation implicated Victor Caraballo, his brother Hector Caraballo, Joel Lebron, Cesar Mena, and Jesus Roman (also known as "Tito," "Tico," or Jesus Roman Torres) as the five perpetrators.
Three law enforcement officers made the first contact with Lebron and Roman some time between 1:00 a.m. and 2:00 a.m. on Monday, April 29, 2002. The police drew their guns; Lebron and Roman were handcuffed and searched. Their clothing was removed, and they were given jumpsuits to wear. They were driven separately to FDLE's Orlando headquarters, arriving at approximately 2:40 a.m.
When a detective ascertained that Roman was a juvenile, the police attempted to contact Roman's parents. They visited Evelyn Roman, Roman's biological mother, who is also Joel Lebron's sister, at Evelyn Roman's home in Orlando. Initially, she was too distraught to talk to the police.
Police then drove the four suspects in custody, including Roman, to Miami Beach for processing. There is no indication in the record that Roman was questioned or interviewed before his arrival in Miami Beach later on Monday. During that afternoon, a detective called Ms. Roman to notify her that her son had arrived safely in Miami Beach. Early that evening, the same detective called her again, and an Orlando-based FDLE agent went to Ms. Roman's home to help translate for her and to act as a witness for a tape-recorded call, as well as to get her consent for the police to question her son, Roman.
The interview was conducted by Detective Larry Marrero who had been on the investigation with little or no sleep for at least twenty-five hours. According to the transcript, the questioning began about 5:00 p.m. and five persons were on the call: in Miami Beach, two officers and Roman; and in Orlando, Ms. Roman and a bilingual FDLE agent translating the questions and answers into Spanish for her benefit.[2]
*733 At the outset, Ms. Roman was asked whether she consented to the questioning of her minor son, and she twice granted permission. The interview was conducted by Detective Marrero who then stated, "I'm going to do you [sic] your rights. Do you give me permission to speak with you without a lawyer?" Roman answered, "Yes." Roman was asked if he understood that right and he again answered, "Yes." The detective then stated, "If you can for me, sign for me with your initials on, on the first . . . Evelyn . . . on . . . you understood that right?" Ms. Roman answered, "Yes."
The recording and the transcript continues as follows:
Detective: OK. Do you understand that some . . . what, what you tell me today can be used against you in court?
Roman: Yes.
Detective: Do you give me permission to speak with you?
Roman: Yes.
Detective: And you understand that right?
Roman: Yes.
Detective: Put you initials here. Evelyn, did you understand those rights?
Ms. Roman: Yes.
Detective: After I've told you all this, do you give me permission to speak with you?
Roman: Yes.
Detective: Have I you . . . have I made any promises?
Roman: No.
Detective: And have I . . . have I tortured you? Have I done something wrong?
Roman: No.
Detective: OK. Put your initials there for me, me, me. Evelyn, do you understand?
Mrs. Roman: Yes.
Detective: OK. Now . . . after reading all these rights, do you give me permission to speak with you without a lawyer?
Roman: Yes.
Detective: OK. Put your initials there . . . and . . . here. Your name and the date
[There is a pause of a approximately four seconds]
Detective: The date is 4-29-02.
[Another pause].
The interview then continues.
It is clear from the tape and the transcript that Roman was provided with a Spanish-language printed notice of constitutional rights. The form, which is in evidence, had the five Miranda-required rights and a space after each for his initials. It is titled "Constitutional Rights Notice," and states, as translated, the following:
1. You have the right to remain silent. You do not have to make any statements if you do not wish to.
Do you understand this? _____
2. Anything that you say can and will be used against you in court.
Do you understand this? _____
3. You have the right to an attorney for legal advice at this moment or at any other future moment. If you do not have the means to pay for an attorney, one will be provided to you.
Do you understand this? _____
*734 4. Do you wish to have an attorney present now?
5. Knowing your rights the way they have been explained to you, are you willing to answer the questions without having an attorney present?
Roman signed at the bottom of the form, and it was witnessed by the two officers. During the "doing" of the rights, Detective Marrero omitted a description or reading of some of the disclosures on the printed form. The detective admitted that he never had Roman read the rights out loud to determine if Roman could actually read and understand his other rights, particularly his right to court-appointed counsel. Roman was never asked if he could read Spanish, but neither did Roman at any time state that he could not. The tape recording suggests that the detective was instructing Roman to initial the line regarding the right to court-appointed counsel while he was asking him unrelated questions about whether or not he had made him any promises, tortured him, and was willing to speak to him. Nevertheless, Roman followed the detective's instructions and initialed the line indicating that he understood he had a right to court-appointed counsel, as well as all the other rights. The detective admitted that he never verbally advised Roman of that right.
Ms. Roman, who had to rely on what was being articulated, only heard a paraphrased summary of her son's constitutional rights. The transcript discloses that Ms. Roman consented again to the interview after her son was sworn and answered preliminary questions regarding his age,[3] address, telephone number, occupation, and education. The Miami Beach detective then ended the telephone connection with Ms. Roman, advising that he would call her back after the interview. Ms. Roman said, "OK."
Before his arrest, Roman had been attending Mid-Florida Tech studying for a high school graduate equivalency diploma, having completed ninth grade. His proficiency in reading Spanish was never established.[4] The taped questioning took approximately two hours, concluding at 7:07 p.m., which included a break of unspecified duration during which Roman was given something to drink, some pizza, and access to a bathroom.
The questioning was straightforward. Roman confessed to the armed robbery near the beach, the attempted murder of Nelson Portobanco and the rape and murder of Ana Maria Angel, with details on the roles played by the four co-defendants. There is no evidence that Roman was coerced or deceived during the questioning.

II. Standard of Review

We review the trial court's determination of historical facts under the "competent substantial evidence" standard of review, and the ruling on a motion to suppress comes to us with a presumption *735 of correctness. We review de novo, however, the application of constitutional principles to those facts. Schoenwetter v. State, 931 So.2d 857, 866 (Fla.2006).

III. Analysis

The State asserts that the trial court reversibly erred in its determinations that Roman was not clearly informed of his Miranda rights and that his Miranda rights were not validly waived.[5] There is no question that in this case the questioning of Roman took place while he was in custody. In such a setting, Miranda requires "four warnings now thoroughly ingrained in police procedure: (1) that the individual has the right to remain silent, (2) that anything the person says may be used in court, (3) that the individual has the right to have an attorney present during questioning, and (4) that if the individual cannot afford an attorney, one will be appointed for him before questioning." Everett v. State, 893 So.2d 1278, 1284 (Fla.2004). According to Miranda, "The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." 384 U.S. at 476, 86 S.Ct. 1602. The State bears the burden of proving that the waiver of the Miranda rights was knowing, intelligent, and voluntary. Ramirez v. State, 739 So.2d 568, 575 (Fla.1999). We have considered in our decision the following language from the Ramirez case:
[W]here a confession is obtained after the administration of the Miranda warnings, the State bears a "`heavy burden'" to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel, especially where the suspect is a juvenile.

Id. (emphasis added).
The trial court must determine under the "totality of the circumstances" whether a waiver of Miranda warnings is valid. Ramirez, 739 So.2d at 575. The Ramirez court further explained that in cases involving juveniles, these circumstances include: 1) the methodology employed to administer the Miranda rights; 2) the age, experience, background, and intelligence of the child; 3) whether the parents were contacted and whether the child had an opportunity to speak with them prior to giving the statement; 4) whether the questioning occurred in the station house; and 5) whether the child executed a written waiver of rights. Ramirez, 739 So.2d at 576.

(1) Methodology
While the methodology used by the police in this case in administering Roman his Miranda rights was less than perfect, we begin with the inescapable fact that Roman executed a valid rights waiver form. Certainly, using a written waiver of rights is to be encouraged, and such a written waiver is one of the five criteria enumerated above. There are numerous cases, albeit none involving a juvenile, where the execution of such a form was alone sufficient to constitute a valid waiver. See e.g., United States v. Johnson, 426 F.2d 1112, 1115 (7th Cir.1970) ("Having signed the written waiver form, without evidence to the contrary, [the defendant] cannot now contend that he did not understand his rights.").
The record does not show that there was any cajoling, trickery, coercion or deception. *736 The tape recording reflects that the officers were courteous and professional. Roman was given something to drink, given pizza to eat, and had access to a bathroom. Although not required, the officers included Ms. Roman in the pre-statement interview.
On the other hand, there is no case involving a juvenile that holds a written waiver alone is sufficient to meet the State's burden. Additionally, once a law enforcement officer starts verbally explaining the rights to the juvenile defendant, the officer should explain all the rights, not just some of them. Thus, there is some support for the trial court's finding that obtaining the written waiver was "perfunctory at best." A better practice would be for the officers to read the entire form out loud, or have the defendant do it. Afterwards, the officers should make sure that the defendant can read and in fact understands his or her rights, and is willing to waive them.
However, under the facts of this case, we conclude that a perfunctory verbal description of the written rights waiver form does not mean that Roman did not voluntarily waive his rights. He was sixteen years old at the time of the interview. The form was initialed next to each right and properly executed and witnessed while the mother was on the conference call. Roman never complained about his lack of literacy or understanding. Detective Marrero asked him: "[A]fter reading all these rights, do you give me permission to speak to you without a lawyer?" Roman did not hesitate in answering "yes." During his statement, he calmly related the facts surrounding the crimes.

(2) The age, experience, background, and intelligence of the child
Roman was sixteen at the time and had completed ninth grade. It appears from the transcript that Roman was more comfortable speaking Spanish than English. Although we do not know his proficiency in reading and writing Spanish, Detective Marrero observed Roman reading it. For us to conclude otherwise, we would have to assume that Roman was pretending to be able to read the form when he could not. This would be pure conjecture.

(3) Whether the parents were contacted
In Ramirez, the Florida Supreme Court held that notice to parents and the opportunity to consult with a parent before questioning is also a factor to be considered regarding the Miranda warnings when a suspect is a minor. The trial court held in this case that a factor in its decisions to suppress evidence of the confession, though "not the determining factor," was "the officer's failure to allow the mother to speak to her son prior to the interrogation." However, the record indicates otherwise.
Roman's mother was well aware of the search for both her son and her brother (suspect and alleged shooter Joel Lebron), because two officers had been to her apartment in Orlando just after midnight on April 29 to locate Lebron. The officers notified her when Roman was taken into custody. Initially, she was too distraught to talk to the lead detective about her son and the detective's plan to interview him. She was called again on the afternoon of April 29 to inform her that Roman had arrived in Miami Beach.
Before any substantive interview occurred with her son, Ms. Roman was included in the telephonic conference and an Orlando-based agent participated in order to translate for her. Neither she nor her son asked for the interview to be terminated, for time to consult an attorney, or for a private conversation with each other. During the call, she expressly granted the *737 lead detective permission to speak with her son. She expressly acknowledged her son's permission to the detective to question him without a lawyer present. She confirmed her son's understanding (while Roman was listening to that confirmation by his mother on the call) that, "what you tell me today can be used against you in court." She clearly understood that the interview would continue without her further participation in the conference call, did not ask to be allowed to stay on the line during that further questioning, and did not object when told she would be called back when the interview was complete.
These circumstances are far removed from those presented in the case relied upon by Roman. In Allen v. State, 636 So.2d 494, 496 (Fla.1994), the mother asked to speak to her son while the police were questioning him. In this case, Ms. Roman was on the telephone at the outset of the questioning, heard her son receive Miranda warning, understood that he was also initialing and signing a printed form, and did not ask that the questioning be stopped or that she be afforded a private conference with her son before the substantive questioning began.
The parental notification statute relied upon in Allen, section 39.037(2), Florida Statutes (1994), became section 985.207(2), Florida Statutes (2002). The person taking a juvenile into custody is directed "to attempt to notify the parent, guardian or legal custodian of the child." § 985.207(2). The State undisputedly complied with that obligation. Furthermore, there is no constitutional requirement that the police notify a juvenile suspect's parents prior to questioning, and the failure to do so would not by itself vitiate the voluntariness or sufficiency of the juvenile's waiver. J.G. v. State, 883 So.2d 915, 924 (Fla. 1st DCA 2004).

(4) Whether the questioning occurred in the station house
The confession here was elicited at the police station house fifteen hours after Roman's arrest; after his clothes had been removed and he had been given an inmate jumpsuit; and after he had been transported from Orlando to Miami. But there is nothing to indicate that any abuse, psychological tricks or interview ploys was utilized.

(5) Whether the child executed a written waiver of rights
As stated in Ramirez, a signed written waiver of a rights form is one of the five criteria the trial court should consider in cases involving juveniles. This would not have been such a close case had the State shown that the defendant actually read and understood the form. But it is undisputed that Roman initialed and signed the form. We have found no case where a statement was suppressed where a valid written waiver form had been executed by the defendant. The contrary is the rule. See United States v. Sledge, 546 F.2d 1120 (4th Cir.1977); United States v. Coleman, 524 F.2d 593, 594 (10th Cir.1975) (stating that "information of rights by written form has been upheld in many Circuits."); N. Carolina v. Strobel, 164 N.C.App. 310, 596 S.E.2d 249, 253 (2004) ("[I]t is not essential that the warnings required by Miranda be given in oral rather than written form. Thus, the mere fact that Sergeant King did not read the Miranda warnings to defendant, standing alone, does not render defendant's waiver ineffective.").

IV. Conclusion

Our opinion today should not be interpreted as approving a methodology of reading some rights and not others, then asking a defendant to sign a written waiver form. If an officer is going to explain a defendant's rights, he or she should cover them all, not just some. We have evaluated *738 the voluntariness of this juvenile confession with "special care." Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948); see also In re Gault, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Under the totality of the circumstances, we conclude that the waiver of the Miranda rights was knowing, intelligent, and voluntary. Accordingly, we reverse the "Amended Order Granting Defendant, Jesus Roman's, Motion to Suppress Statements."
Reversed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) [hereinafter Miranda].
[2] Ms. Roman requested permission from the Orlando officers to speak to her son and was told to ask Detective Marrero. She never did. The trial court stated:

[T]his Court finds that the officer's failure to allow the mother to speak to her son prior to the interrogation is but one factor (not the determining factor) to be considered in determining whether a juvenile statement should be suppressed. However, the Court does find that the officer who was in Orlando with the mother should have informed the Miami officers that she made a specific request to speak to her son.
[3] The record is not clear regarding Roman's age. In the transcript of the tape recording, Roman says that he was born September 25, 1985, and that he was fifteen years old as of the interview, April 29, 2002. The court file indicates that his date of birth was December 25, 1985. Using either of the two dates, Roman was sixteen when questioned, although the court's order finds that he was fifteen.
[4] Detective Marrero testified at the suppression hearing that he asked Roman, "Do you know how to read?" to which Roman replied, "Yes." This is not contained in the taped portion of the interview conducted on April 29, 2002. Detective Marrero further testified at the suppression hearing that he did not have an off-tape interview with Roman and that everything he said to Roman and everything Roman said to him was contained on the tape.
[5] We agree with the trial court's refusal to suppress on the basis that the mother's request to speak with her son, and the officer's response, operated as an invocation of Roman's right to remain silent.