NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

STATE OF FLORIDA,                      )
                                       )
          Appellant,               )
                                       )
v.                                     )     Case No. 2D14-4181
                                       )
EMERSON ADONIS HERRERA,                )
                                       )
          Appellee.                )
_____)

Opinion filed September 28, 2016.

Appeal from the Circuit Court for Manatee
County; John F. Lakin, Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Cerese Crawford Taylor,
Assistant Attorney General, Tampa, for
Appellant.

Howard L. Dimmig, II, Public Defender,
and Kevin Briggs, Assistant Public
Defender, Bartow, for Appellee.


SALARIO, Judge.

        The State charged Emerson Herrera with being an accessory after the fact

to murder.  Mr. Herrera was sixteen years old at the time of the alleged offense.  The

trial court granted a motion to suppress his confession, holding that the State failed to

prove that Mr. Herrera had knowingly, intelligently, and voluntarily waived his rights

under Miranda v. Arizona, 384 U.S. 436 (1966).  Reviewing de novo the legal question of whether the Miranda waiver was knowing, intelligent, and voluntary, we reverse.

I.

This prosecution arises from the murder of a sixteen-year-old victim named Dakota Smith.  After an interrogation by Detectives James Curulla and Jeff Beckley of the Bradenton Police Department, Mr. Herrera confessed that he assisted his cousin in disposing of the murder weapon.  At an evidentiary hearing on the motion to suppress, Detectives Curulla and Beckley testified, and audio recordings of the Miranda warnings and a portion of the interrogation, a video recording of most of the interrogation, and a transcript of the entire interrogation were received in evidence.  The following facts emerged.

Not long after Smith's murder, Mr. Herrera was being held in a juvenile detention center on an unrelated offense.  While there, he told a sergeant who worked at the center that he was involved in the Smith murder.  The sergeant passed that information on to Detective Curulla, who reviewed Mr. Herrera's juvenile "face sheet" and learned that he had a lengthy history of criminal charges and was serving a term of juvenile probation.  Detective Curulla asked Detective Beckley to go to the home of Mr. Herrera—who had by then been released from the detention center—to see whether he was complying with the curfew term of his probation.  Mr. Herrera was not at home when Detective Beckley arrived.

The next day, Detective Curulla arrested Mr. Herrera on the probation violation.  He read the Miranda rights from a card issued by the police department:

[Detective Curulla]: Emerson, how old are you?

[Mr. Herrera]: 16 year[s] old.

[Detective Curulla]: 16? Okay. I want to read you your Miranda rights, okay? I need you to say yes or no after, so that if you understand what I'm gonna say to you okay? . . . What grade are you in?

. . .

[Mr. Herrera]: Ninth grade.

[Detective Curulla]: Ninth grade. Okay. You have the right to remain silent. Do you understand that right?

[Mr. Herrera]: Yep.

[Detective Curulla]: Okay. Anything you say can and will be used against you in a court of law. Do you understand that right?

[Mr. Herrera]: Yeah.

[Detective Curulla]: You have the right to talk to an attorney and have him or her present with you before and during questioning[.] Do you undersand that right?

[Mr. Herrera]: Yeah.

[Detective Curulla]: If you cannot afford to hire an attorney, one will be appointed to represent you at no cost before and during questioning, if you wish. Do you understand that right?

[Mr. Herrera]: Yeah.

[Detective Curulla]: You can decide at any time, to exercise these rights, and not answer any questions or make any statements. Do you understand . . . that right?

[Mr. Herrera]: Yeah.

[Detective Curulla]: Okay. So you understand at any time you don't want to talk, you don't have to, right?

[Mr. Herrera]: Yeah.

Mr. Herrera was handcuffed and taken to the police station, where he was put in an interview room with one hand cuffed to a chair. Prior to arresting Mr. Herrera, Detective Curulla tried to call his mother at a number on the face sheet, but no one answered and there was no system to leave a message.

- 3 -

Detective Curulla began an interrogation of Mr. Herrera and was later joined by Detective Beckley. He advised Mr. Herrera that he wanted to discuss the Smith murder. Throughout the interrogation, the detectives reminded Mr. Herrera how serious a charge of murder was. They told him that they did not believe he murdered Smith and that if the killing was in self-defense or there was some other explanation they needed to know. Mr. Herrera repeatedly denied involvement in the murder, telling the detectives that he was with his girlfriend at the time. After one hour, Detective Curulla asked for and obtained a number to contact Mr. Herrera's mother, left the room, and later returned. Around that time, the detectives learned that Mr. Herrera was unable to read.

The detectives confronted Mr. Herrera with his statements to the sergeant at the detention center. He told them that he and his cousin claimed responsibility for the murder to bolster their street credibility and named two people—Christian and Emilio—who could verify that. Around then, roughly two hours into the interrogation, Mr. Herrera asked if he could speak to his mother. The detectives said that they had left a message on her voicemail. Mr. Herrera then provided his grandmother's phone number. Shortly thereafter, Mr. Herrera asked when he could speak to his mother. The detectives again told him that they had left a message for her, and Detective Beckley contacted Mr. Herrera's grandmother to see if she had his juvenile probation officer's phone number. Detective Curulla specifically asked Detective Beckley, "Can you let her know that he's been arrested? We've been trying to get a hold of his mother."

After approximately two hours and five minutes, the detectives left for the stated purpose of visiting Emilio to see if he would corroborate Mr. Herrera's account. Mr. Herrera was placed in Detective Beckley's office, and the interrogation ceased until

- 4 -

the detectives returned. They did so roughly one hour later, advising Mr. Herrera that Emilio did not corroborate his story and resuming the interrogation. At one point, while emphasizing the bad position Mr. Herrera was in because of his statements to the sergeant, Detective Curulla stated that Mr. Herrera had admitted to a murder, that "murderers don't stay in juvenile detention," and that Mr. Herrera would go to "real jail" where he would be "some big man's bitch." After 2.5 hours of interrogation, Mr. Herrera explained that he was present when his cousin shot Smith after a physical confrontation and that he then helped his cousin dispose of the gun.[1] Approximately twenty minutes after that, he repeated the same story. When asked why the detectives should believe him after he had previously lied to them, Mr. Herrera stated that he had thought about Detective Curulla's statements about going to adult jail and being someone else's "bitch."

Approximately twenty minutes later, the detectives again got in touch with Mr. Herrera's grandmother, who then got in touch with his mother. Questioning ceased, with the exception of inconsequential small talk, for one hour and twenty minutes while they waited for his family to arrive. The detectives explained to Mr. Herrera's mother that she controlled the interrogation and that they would stop if she did not want it to continue. She verified that Mr. Herrera had been with his cousin on the night of the murder, allowed the interrogation to proceed, and encouraged Mr. Herrera to cooperate.

---

[1] The trial court found that the confession came after "3 ½ hours of constant interrogation." That finding is not supported by competent substantial evidence. The video and transcript of the interrogation show that Mr. Herrera was questioned for approximately two hours and five minutes before the detectives left him alone for one hour and that he was questioned again for twenty-five minutes before confessing. Rather than 3.5 hours of constant interrogation, that is 2.5 hours of interrogation separated by a one-hour break in the questioning.

Mr. Herrera repeated the story involving his cousin and, at his mother's urging, went with the detectives to the crime scene and showed them where Smith's body had fallen.

The detectives testified that Mr. Herrera appeared "street smart," that he appeared to understand what was happening during the interrogation, and that he offered no indication that he had any difficulty understanding. Their perception is borne out by the interrogation recordings and the audio of the Miranda warnings.

The trial court granted Mr. Herrera's motion to suppress. It found that the detectives "conducted themselves with the utmost dignity and ethics" and that the tactics used "were not mean-spirited, aggressive, or outside the realm of reasonable police interrogation." Nonetheless, it held that the detectives "erred . . . in not taking special care to ensure that this juvenile knowingly, intelligently and voluntarily waived his Miranda rights." In reaching that conclusion, the trial court relied primarily on three circumstances that it believed undermined Mr. Herrera's waiver of his Miranda rights— that the Miranda warnings were read only once and were not "in language understandable to a teen," that the detectives adopted a good-cop/bad-cop approach to which Mr. Herrera "fell prey" after a lengthy interrogation, and the fact that Mr. Herrera's mother was not present at the interrogation. The State timely appeals.

II.

A defendant's waiver of Miranda rights is valid only when "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. There are two elements to a voluntary, knowing, and intelligent waiver: (1) it must be "voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception," and (2) it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon

- 6 -

it." Ramirez v. State, 739 So. 2d 568, 575 (Fla. 1999) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Whether these elements are present depends on the totality of the circumstances, an analysis that requires examination of "all the circumstances surrounding the interrogation." Fare v. Michael C., 442 U.S. 707, 725 (1979). When the defendant is a juvenile, those circumstances include consideration of the "juvenile's age, experience, background, and intelligence, and into whether he has the capacity to understand the warnings given him." Id.

It is the State's burden to prove that, under the totality of the circumstances, a Miranda waiver is knowing, voluntary, and intelligent by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167-68 (1986). A trial court's findings of the historical facts relevant to this issue will be sustained if supported by competent substantial evidence. Thomas v. State, 894 So. 2d 126, 136 (Fla. 2004) (citing Connor v. State, 803 So. 2d 598, 608 (Fla. 2001)). Whether under those historical facts a Miranda waiver is knowing, voluntary, and intelligent is a question of law that we independently review de novo. Id.; see also Ross v. State, 45 So. 3d 403, 414 (Fla. 2010). Applying this standard to the totality of the circumstances revealed by the record of the interrogation and testimony at the evidentiary hearing, we hold that the trial court erred in concluding that the State failed to meet its burden of proving that Mr. Herrera's waiver of his Miranda rights was knowing, voluntary, and intelligent.

In Florida, the leading decision on Miranda waivers by juveniles is Ramirez, upon which the trial court relied in suppressing Mr. Herrera's confession. The defendant in that case was seventeen when interrogated and before that had only limited contact with the justice system. 739 So. 2d at 574. After being implicated in a

murder, he was taken into custody and brought to the police station for questioning. Id. at 572. The police did not tell him his Miranda rights, but they questioned him anyway and got him to confess to breaking into the victim's house. Id. After the defendant made that admission, the police advised him of his Miranda rights, which they minimized by saying that they "don't think that's going to change [his] desire to cooperate with us" and telling him that he was not under arrest. Id. The defendant confessed to the murder, after which he was asked to and did sign a written waiver of his Miranda rights. Id. The defendant's parents were not present during any of the questioning, and the police made only "perfunctory" efforts to contact them. Id. at 578.

The supreme court held that the defendant's Miranda waiver was not voluntary. Id. It highlighted five factors that it considered significant as part of the totality of the circumstances presented by the facts of that case:

> (1) the manner in which the Miranda rights were administered, including any cajoling or trickery; (2) the suspect's age, experience, background and intelligence; (3) the fact that the suspect's parents were not contacted and the juvenile was not given an opportunity to consult with his parents before questioning; (4) the fact that the questioning took place in the station house; and (5) the fact that the interrogators did not secure a written waiver of the Miranda rights at the outset.

Id. at 576 (citations omitted). The court emphasized the first factor most heavily, concluding (1) that "the Miranda warnings were not given until Ramirez had made significant admissions of guilt," (2) that the police decision to downplay the Miranda rights, "thus suggesting that they have no significance, undermines the very purpose of Miranda," and (3) that the police decision to tell the defendant he was not under arrest was "intended to lull a young defendant into a false sense of security and calculated to delude him as to his true position at the very moment that the Miranda warnings [were]

- 8 -

about to be administered." Id. at 576-77. The court found the third factor significant because the defendant's parents were not present and no meaningful effort to contact them had been made. Id. at 577. While explaining that the absence of a defendant's parents during questioning does not automatically render a waiver involuntary, the court found that it was a factor militating against admissibility, "especially in light of the manner in which the Miranda warnings were administered in this case." Id.

In this case, unlike Ramirez, the trial court did not find and the record does not show any coercive, lulling, or otherwise improper conduct by the police that would have affected either Mr. Herrera's understanding of his rights or his freedom to stand on them instead of talking. The police did not delay advising Mr. Herrera of his Miranda rights; they advised him of them immediately upon taking him into custody. The police did not downplay the importance of the Miranda rights or lull Mr. Herrera into a false sense of security about his condition; they communicated them directly without editorializing and, during questioning, emphasized the seriousness of Mr. Herrera's situation. Although Mr. Herrera's parents were not present when he first confessed to his involvement in the Smith murder, there is no indication in this record that their absence had anything to do with his willingness to speak; indeed, his mother's repeated instruction upon arrival at the station was to cooperate with the detectives. The trial court found that the detectives conducted themselves "with the utmost dignity and ethics" and that the tactics they employed were consistent with "reasonable police investigation." On the face of it, and in contrast to cases in which juvenile Miranda waivers have been found involuntary, Mr. Herrera's waiver of his Miranda rights in this case appears to be a free, deliberate, and informed choice. Cf. B.M.B. v. State, 927 So. 2d 219, 222-23 (Fla. 2d DCA 2006) (reversing order denying suppression of confession

by fourteen-year-old where there was no record of the <u>Miranda</u> warnings, police downplayed the gravity of the juvenile's situation, and police made no effort to contact her parents); <u>J.G. v. State</u>, 883 So. 2d 915, 926 (Fla. 1st DCA 2004) (reversing adjudication of delinquency because trial court erroneously denied the motion to suppress confession by thirteen-year-old where girlfriend of victim's mother participated in interrogation and lulled victim into believing that "everything was going to be O.K." and used "deceptive questioning tactics (in which [the detective] actively participated)," thus "delud[ing] Appellant as to his 'true position' ").

Courts confronted with circumstances akin to those in this case have deemed the juvenile's <u>Miranda</u> waiver knowing, intelligent, and voluntary. In <u>James v. State</u>, 814 So. 2d 1155 (Fla. 5th DCA 2002), for example, a seventeen-year-old who dropped out of school in ninth grade and could barely read or spell was arrested for robbery, burglary, and battery and was questioned while in custody at a juvenile assessment center. After trying without success to contact the defendant's mother, the police read him his <u>Miranda</u> rights from a card. <u>Id.</u> at 1157. The defendant acknowledged that he understood each warning and, after interrogation, confessed. <u>Id.</u> Affirming the trial court's order denying a motion to suppress, the Fifth District emphasized that there was "no evidence of coercion or improper conduct on the part of the law enforcement officers" and that the evidence was sufficient to show that the defendant was aware of the nature and consequences of the waiver of <u>Miranda</u> rights. <u>Id.</u> The court noted that the failure to notify a parent was relevant but did not affect the result because "[t]here is nothing in the record to suggest that the fact that [the defendant's] mother was absent affected the voluntariness of his statement." <u>Id.</u>

Likewise, in Padmore v. State, 743 So. 2d 1203 (Fla. 4th DCA 1999), a defendant in a first-degree murder case argued that his postarrest confession should have been suppressed because "[he] was 16 years old, he was intellectually slow, and police did not attempt to contact appellant's mother until more than two hours had passed in the interview." Id. at 1206. The Fourth District affirmed the trial court's order denying the defendant's motion to suppress his confession, reasoning as follows:

> Sufficient competent evidence was introduced during the motion to suppress hearing . . . showing that appellant understood his rights and voluntarily waived them. For example, he had been read his rights and waived them on previous occasions. He was not threatened during his police interview, nor was he promised anything in exchange for his confession. His taped statement to the police demonstrates that appellant is able to plan, think rationally, and relate relevant facts in good detail when necessary. Additionally, law enforcement officers testified that appellant never interrupted them when he was read his rights, that appellant never told them that he did not understand what was being read to him, and that the officers explained appellant's rights in simple terms.

Id. Other cases have reached similar results on similar facts. See Reza v. State, 163 So. 3d 572, 580-81 (Fla. 3d DCA 2015) (reversing order suppressing confession where sixteen-year-old could read and write English and was aware of the penalties he faced and where there was no compelling evidence of misconduct or coercion, even though defendant had asked to speak to his mother, who was not present); McIntosh v. State, 37 So. 3d 914, 917-18 (Fla. 3d DCA 2010) (holding that seventeen-year-old's Miranda waiver was knowing, intelligent, and voluntary where defendant had history of encounters with law enforcement and demonstrated no difficulties in comprehension and there was no coercion, cajolery, or trickery); State v. S.V., 958 So. 2d 609, 611 (Fla. 4th DCA 2007) (holding seventeen-year-old's Miranda waiver knowing, intelligent, and

voluntary where defendant had previously been arrested, understood English, answered questions, and appeared calm and where law enforcement did not do anything wrong).

As did the courts in these cases, we conclude that the totality of the circumstances, including the circumstances deemed relevant in Ramirez,[2] were sufficient to show by a preponderance of the evidence that Mr. Herrera's Miranda waiver was knowing, intelligent, and voluntary. Mr. Herrera was sixteen years old and had significant experience with the criminal justice system. Before he was arrested, he voluntarily told a sergeant at the juvenile detention center that he was involved in the Smith murder. Although he could not read, the Miranda rights were accurately read to him one-by-one. There was no "cajoling or trickery" of the type that concerned the court in Ramirez. Mr. Herrera separately acknowledged that he understood each of his Miranda rights. The audio recording reflects that each acknowledgement was provided confidently and without hesitation. Mr. Herrera did not indicate that he did not understand his rights or ask any questions about them.

At the commencement of the interrogation, the detectives explained that Mr. Herrera was being questioned about the Smith murder. They repeatedly emphasized the seriousness of the subject. Throughout the interrogation, Mr. Herrera did not have difficulty understanding the detectives or communicating with them, and he adjusted his story as new information was introduced. The police did not coerce or threaten Mr. Herrera or make any promises in exchange for a confession. The trial

---

[2]The first three Ramirez factors are the ones most relevant to this case. As to the fourth, there is no dispute the questioning took place at the police station. With respect to the fifth, although Mr. Herrera was not presented with a written Miranda waiver, the trial court found that he would have been unable to read it, and the record is clear that he understood spoken English.

court found that the tactics employed were consistent with reasonable police interrogation. Although Mr. Herrera's mother was not present until after his initial confession, the fact of her absence was not aggravated by police misconduct in the administration of the <u>Miranda</u> warnings as it was in <u>Ramirez</u>. Furthermore, once his mother arrived, she encouraged Mr. Herrera to continue to cooperate with police. With his mother's blessing, Mr. Herrera again confessed and traveled with the detectives to the crime scene to show them where Smith's body had fallen. Based on the record of the interrogation and the detectives' testimony, the totality of the circumstances was sufficient to meet the State's burden of proof.

The trial court's concern that the <u>Miranda</u> warnings contained on the department-issued card read to Mr. Herrera were not "in language understandable to a teen" and were read only once does not alter our conclusion. The trial court did not find that Mr. Herrera failed to understand the nature of his <u>Miranda</u> rights or the consequences of waiving them, which is the ultimate issue here. <u>See</u> <u>Ramirez</u>, 739 So. 2d at 575 (citing <u>Moran</u>, 475 U.S. at 421); <u>see also</u> <u>Fare</u>, 442 U.S. at 726. As described above, the State presented sufficient evidence to support the conclusion that Mr. Herrera understood his rights and the significance of waiving them. There was no indication in the record that the language on the department-issued card or the fact that the <u>Miranda</u> warnings were given once—taken together with the other facts of record— had any bearing on whether Mr. Herrera understood his rights.[3] <u>See</u> <u>Fare</u>, 442 U.S. at

---

[3]To the extent that the trial court's conclusion that the <u>Miranda</u> warnings read to Mr. Herrera were not "understandable to a teen" can be considered a finding of fact that teens generally cannot understand those warnings, it is unsupported by competent substantial evidence. There is no evidence in the record that speaks to the ability of teenagers to understand the language of the department-issued card. The trial court's unsubstantiated conclusion that the language here—which was direct and

726 (finding Miranda waiver knowing in part because "[t]here is no indication in the record that respondent failed to understand what the officers told him").

Likewise, we cannot agree that the length and manner of the interrogation and the fact that Mr. Herrera was scared, when considered in the totality of the other circumstances, rendered Mr. Herrera's confession involuntary. The trial court concluded, and the record supports, that Detectives Curulla and Beckley behaved ethically and that the tactics employed were not mean-spirited, aggressive, or otherwise unreasonable. The employment of a good-cop/bad-cop strategy and the detectives' explicit statements to Mr. Herrera concerning the seriousness of the situation were doubtless intended to encourage Mr. Herrera to confess. However, in light of the evidence showing that Mr. Herrera understood both his Miranda rights and the gravity of the offense involved and that there was no intimidation, coercion, or deception in the interrogation, these tactics did not render his waiver anything other than a free and deliberate choice. See, e.g., Reza, 163 So. 3d at 581 n.7 ("The interrogating detective admitted on the record that they used these techniques[, i.e., misstatements and embellishments of certain facts,] to encourage Reza into confessing any involvement. We conclude these tactics did not stray into the realm of 'improper.' "); McIntosh, 37 So. 3d at 917 ("The 'verbal browbeating' McIntosh was allegedly subjected to during the booking process does not rise to the level of coercion, cajolery or trickery."). Nor does the fact that Mr. Herrera was interrogated for 2.5 hours—with an hour-long break in the

straightforward—was not "understandable to a teen" is not a substitute for evidence showing that to be the case. See Thomas, 894 So. 2d at 136 (explaining that in assessing the totality of the circumstances, a trial court's factual determinations must be supported by competent substantial evidence); see also James, 814 So. 2d at 1156 (holding confession knowing and intelligent where Miranda warnings were read to a seventeen-year-old defendant from a card).

questioning after two hours and five minutes—demonstrate an interrogation so lengthy that we would deem the resultant confession involuntary. See, e.g., State v. Roman, 983 So. 2d 731, 737 (Fla. 3d DCA 2008) (reversing order suppressing confession of sixteen-year-old defendant after two hours of interrogation and fifteen hours at the police station); Padmore, 743 So. 2d at 1206 (affirming the denial of motion to suppress juvenile's confession under facts that included a more than two-hour interview); W.M. v. State, 585 So. 2d 979, 984 (Fla. 4th DCA 1991) (affirming denial of ten-year-old defendant's motion to suppress his confession made while spending "nearly 6 hours in a police station or police vehicle").

Finally, the trial court's statement that it was "not convinced that the detectives made a good-faith, diligent effort to reach the Defendant's mother before questioning" does not affect the outcome here. The trial court stopped short of actually finding as a fact that the detectives did not make such an effort. Nor would such a finding have been supported by competent substantial evidence. Detective Curulla tried to contact Mr. Herrera's mother prior to arresting him and continued attempts to contact her during the interrogation. When Mr. Herrera asked for his mother, Detective Curulla told him they were trying to reach her and had left messages and had also called his grandmother twice. Mr. Herrera did not say, in words or by conduct, that he did not want to talk to the detectives until his mother could be contacted or present, and he continued to talk with them notwithstanding her absence.[4] When his mother did arrive,

---

[4]Although police questioning must cease when "a juvenile indicates to police that he or she does not wish to speak to them until he or she has had an opportunity to speak with parents," Frances v. State, 857 So. 2d 1002, 1004 (Fla. 5th DCA 2003), that is not what happened here. Mr. Herrera asked to speak to his mother, but he did not indicate that he did not want to talk until she was present. See Reza, 163 So. 3d at 580 (describing analogous request as "equivocal and not an invocation of [the

she encouraged him to continue doing what he had already done: cooperate. Where a juvenile confesses prior to speaking with his parents, it militates against a determination that the confession was voluntary but does not require such a determination. Ramirez, 739 So. 2d at 568. In view of these specific circumstances, and the others described above, we do not attribute significant weight to any asserted delay in contacting Mr. Herrera's mother or in her arrival at the station. See Reza, 163 So. 3d at 579-80 (holding that police officer's statements, in response to juvenile defendant's request to see his mother that they could not arrange it, did not render Miranda waiver involuntary under the totality of the circumstances); Brancaccio v. State, 773 So. 2d 582, 584 (Fla. 4th DCA 2000) (holding, in a case where police lied in response to juvenile's question about whether his parents had been notified, that "the audio tape supports the finding that in substance [the] defendant did not actually ask for his parents to be present and that he voluntarily confessed anyway"); Padmore, 743 So. 2d at 1206 (holding that two-hour delay in contacting defendant's mother did not render confession involuntary under the totality of the circumstances).

III.

Under the totality of the circumstances, the State met its burden to show that Mr. Herrera's waiver of his Miranda rights was knowing, intelligent, and voluntary. As such, the trial court erred by granting Mr. Herrera's motion to suppress. The trial court's order doing so is reversed, and the case is remanded for further proceedings consistent with this opinion.

---

juvenile's] right to remain silent" until a parent could arrive); Brancaccio v. State, 773 So. 2d 582, 584 (Fla. 4th DCA 2000) (holding that juvenile's inquiry about whether his mother had been contacted was not a request "for his parents to be present").

Reversed and remanded.


KELLY and LaROSE, JJ., Concur.